# Staunton

## W. W. CRANDALL v. WILLIAM W. WOODARD, JR., ET AL.

September 10, 1965.

Record No. 5990.

Present, All the Justices.

*George E. Allen* and *Allen, Allen, Allen & Allen,* on brief, for the plaintiff in error.

Submitted on brief for the plaintiff in error.

*L. Paul Byrne* (*George F. Tidey; Bremner, Merhige, Byrne, Montgomery & Baber,* on brief), for the defendants in error.

SPRATLEY, J., delivered the opinion of the court.

The plaintiff, W. W. Crandall, instituted this action by a motion for judgment, seeking to recover from the defendants, William W. Woodard, Jr. and Le-Wood Homes, Incorporated, damages in the sum of $75,000.00. He alleged that defendants had wilfully and maliciously destroyed certain of his personal property, that is, a continuous laminating press and its necessary attachments and accessories.

The defendants, jointly and severally, filed an answer denying that they were indebted to the plaintiff in any amount. They averred further that they intended "to rely upon any and all proper proof of defense" and reserved "the right to alter, amend or modify such pleadings as they may be advised, up to and including the day of trial."

A jury was empaneled, and at the conclusion of plaintiff's evidence, a motion of the defendants to strike the evidence, and enter judgment in their favor, on the ground that plaintiff had failed to show that he had either title, or the right of possession, to the personal property involved, was overruled. At the conclusion of all the evidence, defendants renewed their motion to strike, upon the same ground, and the motion was sustained. Summary judgment was then entered for defendants.

The sole assignment of error by plaintiff is that the court erred in its ruling, "since the evidence was entirely sufficient to require it to submit the issue of liability to the jury."

In his brief, plaintiff argues that the evidence was sufficient to present to the jury the question whether he had title to, or such interest in, the property involved as made it subject to a bailment.

The facts are without material conflict:

The Crandall Corporation of Virginia, of which plaintiff was President, was the owner of certain real estate, with improvements thereon, together with certain personal property, constituting its manufacturing plant at Doswell, Virginia. Small Business Administration, [SBA] an agency of the Federal Government, was the holder of a note evidencing a loan made to the Crandall Corporation, which note was secured by a deed of trust executed by that corporation, conveying its real and personal property to a trustee. The corporation failed to pay the note at its maturity, and at the request of SBA, the trustee, after due advertisement, held a foreclosure sale of the property conveyed in the deed of trust.

The sale, held on November 20, 1961, was conducted by auctioneers employed by the trustee. Prior to the sale, they furnished prospective purchasers with a brochure setting out the terms and conditions thereof. On the day of the sale, they further read aloud to the persons assembled the provisions of the brochure.

The terms and conditions required "a deposit of 25% of the purchase price payable in currency or certified check payable to the order of the auctioneers at the time of recordation of highest offer, balance payable in a similar manner within twenty-four hours after ratification of sale and/or sales."

The brochure further stated:

"8. Upon failure to comply with above conditions all lots shall be resold by public or private sale, without further notice, and the deficiency (if any) attending such resale shall be made good by the defaulter, together with all charges attending same. This condition is without prejudice to any other rights which we may have, including our right to enforce the contract made at this sale without such resale, if we think fit."

Crandall and W. W. Woodard, Jr., President and agent of Le-Wood Homes, Inc., were present at the sale. The real property was knocked down to Woodard for the sum of $68,000.00. He immediately made the required down payment of 25%. Crandall was the highest bidder on five lots of personal property. One lot included the laminating press with its attachments and accessories. His total bids aggregated $6,320.00, which included $4,000.00 bid on the

press. He promptly made a down payment of 25% or $1,580.00 on the day of sale.

Crandall testified that prior to the purchase of the personal property by him and of the real estate by Woodard, he asked Woodard that, if he [Woodard] purchased the real estate, and he [Crandall] purchased the personal property, would Woodard permit him to leave the press in the plant until he [Crandall] could make arrangements to remove it. He said that Woodard replied that: "(H)e had never been in the plant before and did not expect to buy it, and that they had no immediate plans for using it and that I could leave it in the plant. He gave me the impression it could be something like six months, but that part was not definite."

Woodard denied that he had any such conversation with Crandall prior to the sale, or that he had ever made any agreement with the latter as to the disposition of any personal property which might be purchased by Crandall. There is no claim that the two men discussed the matter after the auction sale.

On November 21, 1961, twenty-four hours after his bids were accepted, Crandall did not comply with the terms and conditions of the sale by paying the balance of 75% due on the property upon which he was the successful bidder.

On November 22, 1961, two days after the sale, G. D. Holden, trustee, and Chief of the Regional Financial Assistance Division of SBA, wrote to Crandall by certified mail, called the attention of the latter to his failure to make the payment in question, and demanded the "immediate full payment of the balance due."

Crandall, by letter of the same date, November 22, 1961, requested SBA to allow the balance due from him "to be paid on a deferred basis." On November 28, 1961, he was advised by letter from SBA that his request could not be granted.

On November 29, 1961, the trustee again wrote Crandall, saying that "*not having received remittance of the balance due on your purchase as demanded* in our letter of November 22, 1961, *your writer, as trustee, will proceed to again offer for sale the machinery previously bid in by you.* In the event of your $1,532 deposit and the net amount received at the resale of the property does not equal the $6,320, amount of your bid, demand upon you for the payment of the difference will be required." (Emphasis added.)

On December 11, 1961, Edwin J. Slipek, counsel for SBA, wrote plaintiff, enclosing copies of the trustee's letters of November 22 and

29, 1961, thereby reaffirming both the election of the trustee to resell the property, and the denial by SBA of the request of Crandall to be allowed to make payment on a "deferred basis."

Subsequent to the receipt of the last mentioned letter, Crandall made several fruitless efforts to obtain funds to pay the balance due by him. Finally, he advised Slipek that it was impossible for him to make the payment.

On January 2, 1962, Slipek advised Crandall in a telephone conversation that the real property involved would be conveyed to the purchaser on January 3, 1962; that the trustee was "restive and anxious" to close the machinery sale; and that the time was fast approaching when Crandall's request for more time could not be heeded.

The defendants had been instructed, immediately after the auction sale, by SBA not to permit any equipment, remaining in the building purchased by them, to be removed without its permission. The key to the building was retained by SBA, the consummation of its sale being delayed by a controversy over taxes due thereon.

The laminating press, with its attachments, was a large, heavy machine used for pressing together three layers of wood 18 feet long. Its length was estimated at from 60 to 70 feet, and picture exhibits showed that it was several yards high and several feet wide.

On January 3, 1962, the trustee conveyed the real estate to Commonwealth Land Corporation, nominee of the defendants, and actual possession of the premises by the grantee was taken on that day.

Defendants advised SBA that while there was no immediate necessity for the removal of the laminating press, they contemplated that the floor space occupied by it would be needed by them in a very short time, possibly two weeks; and they, therefore, desired either to have the machine removed, or to be given permission to remove the same out of the way. Subsequently, defendants made several inquiries of the trustee and SBA about the removal of the machine.

Slipek said that on January 22, 1962, he advised plaintiff that SBA and the trustee "were proceeding to sell" the machinery bid in by him without further delay, and that "if he could remit the balance due on any of the items he bid in prior to the time the said property was disposed of by this Agency, delivery of the same would be made to him; *however, nothing short of a full cash payment by certified check would suffice*." (Emphasis added.)

On February 6, 1962, Crandall paid SBA the sum of $750 to cover the balance of his bids on two items of personal property purchased by him. These two items were, in turn, conveyed by Crandall to T. Frank Flippo & Sons, Inc. At the request of Crandall, defendants were authorized to deliver those items to the Flippo corporation. This was done.

On February 26, 1962, defendants requested permission of the trustee to remove the laminating press from their building, because it was in their way and interfered with their operations. The trustee granted permission, advising the defendants to "detach the 25 HP motor and go ahead and dispose of the balance as best they could, in order to make its space available for their use." Thereafter, the motor was detached and the press was cut up and moved from the building to the yard. The plant supervisor of Le-Wood Homes, Inc., testified that: "It would have been impossible to remove it as a whole unit without pulling down part of the building."

On September 4, 1962, the press and its accessories were, after due notice, sold by the trustee, in compliance with Section "8" of the terms and conditions of the auction sale. The highest bid was $60, and it was sold for that sum.

At no time did the trustee retract the position he took in his letters of November 22 and 29, 1961. The letters show that he retained control and possession of the personal property. The only way Crandall could prevent it from being resold was to make full payment of the balance of his bid thereon prior to the resale. This, as we have stated, he wholly failed to do. Thus, he never acquired the right to take possession of the press. He could not, therefore, as a bailor, deliver possession of the property to anyone.

Crandall and the defendants conducted their business with reference to the property purchased at the auction sale solely with the trustee or the SBA and its agent. They had no contact or conference with each other after the auction sale.

The evidence clearly and conclusively shows that Crandall was aware of the terms and conditions of the sale on November 20, 1961; that he failed to pay the balance of the money due on his purchase price within twenty-four hours after the acceptance of his bid, or at any time thereafter; and that he did not make any demand for the possession of the personal property or undertake to remove it from the premises. He acquired, at the time the property was knocked down to him, the right to its title and possession only if he complied

with the terms and conditions of purchase. His failure to carry out his contract, and the final election of the trustee, in his letter of November 29, 1961, to resell the personal property, still in his complete possession, or that of SBA, unequivocally terminated, as of that date, all possessory rights, which Crandall may have previously had.

The election made by the trustee on November 29, 1961, was not affected by any subsequent negotiations between him and Crandall, or by Slipek's offer of grace to accept payment if made before a resale. Crandall did not comply with the terms of sale, did not enter into any agreement concerning the property after its sale to him, and did not accept the offer of grace. His right to acquire the property could not arise until he made the payment required. He never had the property in his possession. He had no title to it nor the right of possession at the time of its resale, and hence no actionable claim against defendants.

In Williston on Sales, Vol. 2, Sections 296 and 297A, pages 200-207, this is said as to the formation of contracts at auction:

"Not only is the contract complete when the hammer falls, but the property in the goods passes then, *unless some term of the bargain makes it impossible that it should do so.* It is of course possible that such conditions may be imposed by the terms of the sale as to make immediate transfer of the property in the goods impossible. Frequently an announcement of an auction contains a statement of special terms or conditions on which the sale will be made or the amounts bid will be payable." (Emphasis added.)

In Black's Law Dictionary, 4th Ed., at page 179, it is said that the term "bailment" imports "A delivery of goods or personal property, by one person to another, in trust for the execution of a special object upon or in relation to such goods, beneficial either to the bailor or bailee or both, and upon a contract, express or implied, to perform the trust and carry out such object, and thereupon either to redeliver the goods to the bailor or otherwise dispose of the same in conformity with the purpose of the trust."

In 2 Mich. Jur., Bailments, § 3, page 675, this is said:

"* * * It has also been stated as a rule that no particular ceremony or actual meeting of minds is necessary; it is the element of lawful possession, however created, and duty to account for the thing as the property of another that creates the bailment, regardless of whether or not such possession is based on contract in the ordinary sense. In the ordinary case, the nature of the bailment requires that there be a delivery by the bailor and an acceptance by the bailee."

See also 8 C. J. S., Bailments, § 1, page 311.

■ It is true that there was conflict in the evidence relative to the contention of Crandall that, prior to the auction sale, Woodard agreed that if Woodard bought the real property, Crandall could leave in the plant such personal property as Crandall bought at the sale, for an indefinite time. The conflict is not material to the issues here. At the time the alleged agreement was entered into, it is undisputed that Crandall had neither the title to, nor possession of, the property. The agreement was vague, uncertain and indefinite. It did not specify the particular type of property involved, the quantity thereof, or the time it might remain on premises which might be acquired by Woodard.

In 8 C. J. S., Bailments, § 12, at page 358, this is said:

"Property that is not in existence, or that is to be acquired by a person in the future, is not bailable, that is, no contract with respect to such property can operate by way of bailment until the property has come into existence, or until title thereto or possession thereof has been acquired by the bailor, and until it has been taken into possession by the bailee."

The defendants did not acquire title or the right of possession to the real property until January 3, 1962. There was no opportunity for the creation of a bailment as between them and Crandall prior thereto.

■ The facts bring this case within an exception to the general rule that a bailee is estopped from denying the title of his bailor. Here, the trustee had paramount title to the press until it was resold, and the complete possession as well during the same time.

In *Bell Storage Company* v. *Harrison,* 164 Va. 278, 285, 180 S. E. 320, this is said:

"In accordance with the well-settled general rule that a bailee is estopped to deny his bailor's title, a warehouseman with whom goods have been deposited is estopped, in the absence of the intervention of a paramount title, from disputing the title of the depositor. (Citing cases.)

"It is true that the rule that a bailee is estopped from denying his bailor's title is subject to the exceptions that the bailee is excused for non-delivery of the property when he can show that he has surrendered it to the rightful owner, or where the bailee has been dispossessed of the subject matter of the bailment by legal process, or where he can show he has been authorized to defend the title by the person in whom it is invested, or where the bailor parts with his title

during the bailment. But it is said, *'The true ground on which a bailee may set up the jus tertii is that the estoppel ceases when the bailment on which it is founded is determined by what is equivalent to an eviction by title paramount.'* 3 R. C. L., page 88, section 16; pages 89, 90, sections 17, 18, and 19, and cases cited." (Emphasis added.)

See also 6 Am. Jur., Bailments, §§ 105, 106, 107, 114; 8 C. J. S., Bailments, § 21.

The transaction with reference to the sale of some of the property to the Flippo corporation evidences the fact that paramount title and possession, and, indeed, the only title to, and possession of, the personal property remaining on the premises was in the trustee, and the only bailor of this property was the trustee.

We find no error in the ruling of the trial court, and its judgment is affirmed.

*Affirmed.*