**Steven YORK, M.D. and Risa Adler–York, Plaintiffs,**

**v.**

**Howard W. JONES, Jr., M.D., Suheil J. Muasher, M.D., Medical College of Hampton Roads, an instrumentality of the Commonwealth of Virginia, t/a the Howard and Georgeanna Jones Institute For Reproductive Medicine, and Sentara Health System, t/a Sentara Norfolk General Hospital, Defendants.**

**Civ. A. No. 89–373–N.**

United States District Court, E.D. Virginia, Norfolk Division.

July 10, 1989.

---

Jeremiah A. Denton, III, R. Craig Gallagher, Virginia Beach, Va., and Lori B. Andrews, Chicago, Ill., for plaintiffs.

E. Duncan Getchell, Jr., Paul C. Kuhnel, McGuire, Woods, Battle & Boothe, Richmond, Va., A.T. Mayo and Ann K. Crenshaw, and McGuire, Woods, Battle & Boothe, Norfolk, Va., for Howard Jones, Jr., Suheil Muasher and Medical College.

Robert C. Nusbaum and Hofheimer, Nusbaum, McPhaul & Samuels, Norfolk, Va., for Howard Jones, Jr. and Suheil Muasher.

Conrad M. Shumadine and Willcox & Savage, Norfolk, Va., for Sentara.

## MEMORANDUM OPINION AND ORDER

CLARKE, District Judge.

This matter comes before the Court on a Motion to Dismiss filed by defendants Howard W. Jones, Jr., M.D. (Dr. Jones), Suheil J. Muasher, M.D. (Dr. Muasher) and the Medical College of Hampton Roads (Medical College) pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1] The plaintiffs have responded, the parties have waived oral argument, and the Motion is therefore ripe for disposition.

### Introduction

The plaintiffs' Complaint in this case raises an issue of first impression in the rapidly developing field of human reproductive technology. The plaintiffs, Steven York, M.D. and Risa Adler–York (the Yorks), are the progenitors of the cryopreserved human pre-zygote (the pre-zygote) at issue in this case. The plaintiffs seek the release and transfer of the pre-zygote from the defendant The Howard and Georgeanna Jones Institute For Reproductive Medicine (Jones Institute) in Norfolk, Virginia to the Institute for Reproductive Research at the Hospital of the Good Samaritan located in Los Angeles, California. The defendants have refused to consent to an inter-institutional transfer of the pre-zygote.

---

1. The Motion to Dismiss filed by defendant Sentara Health System, t/a Sentara Norfolk General Hospital is not presently before the Court.

This matter was originally brought before the Court on plaintiffs' Petition for a Temporary Restraining Order and Preliminary Injunction. On June 9, 1989, the Court held an evidentiary hearing on plaintiffs' request for a preliminary injunction. The Court found that the plaintiffs had failed to establish that any irreparable harm would befall either the pre-zygote or the Yorks during the relatively short period of time required to bring this matter to trial. Accordingly, the Court denied the Motion for Preliminary Injunction.

The plaintiffs' Complaint in this matter is in four counts: breach of contract (Count I); quasi-contract (Count II); detinue (Count III) and 42 U.S.C. § 1983 (Count IV). The plaintiffs seek declaratory, injunctive and compensatory relief. The plaintiffs have alleged diversity jurisdiction pursuant to 28 U.S.C. § 1332 and federal question jurisdiction pursuant to 28 U.S.C. § 1343(a)(3). Because this matter is before the Court on defendants' Motion to Dismiss the Complaint for failure to state a claim upon which relief can be granted, the Court will construe the Complaint in a light most favorable to the plaintiffs.

### Facts

The plaintiffs have made the following factual allegations in their Complaint. The plaintiffs were married in 1983 and have been attempting to achieve a pregnancy since 1984. Because of damage to Mrs. York's remaining Fallopian tube, the Yorks are unable to achieve a pregnancy through normal coital reproduction. The plaintiffs were advised that through *in vitro* fertilization, plaintiffs would be able to become the parents of their own genetic child. The *in vitro* fertilization process involves removing one or more oocytes or eggs from the woman's body, fertilizing those eggs *in vitro* (outside the womb) with the husband's sperm, and then depositing the developing masses into the woman's uterus up to the eight-cell stage. (Complaint, Ex. A).

In the spring of 1986, plaintiffs consulted with Drs. Jones and Kreiner at the Jones Institute in Norfolk, Virginia in order to determine whether they were viable candidates for the *in vitro* fertilization (IVF) program, known as the Vital Initiation of Pregnancy (VIP) program. The Yorks were accepted into the IVF program and signed VIP Consent Form No. 6B. (Complaint, Ex. A) Consent Form 6B stated, and Dr. Kreiner assured the Yorks, that the expectation of pregnancy is about 20 percent after the transfer of one fertilized mature egg, about 28 percent after the transfer of two fertilized mature eggs and about 38 percent after the transfer of three fertilized mature eggs.[2] At the time the Yorks entered the IVF program in Norfolk, they were residents of New Jersey. During the course of treatment, the Yorks moved to California.

The Yorks returned to the Jones Institute on four separate occasions to undergo the *in vitro* fertilization process: August

---

**2.** These allegations are made in paragraph 13 of plaintiffs' Complaint. Plaintiffs further allege that:

> In fact, the clinical pregnancy rate being experienced by the Jones Institute at the time was under 15%. The Jones Institute also omitted material information concerning the live birth rate. This willful misrepresentation and omission were reasonably relied on by the plaintiffs to their detriment in selecting the Jones Institute.

Under Virginia law, the elements of actual fraud are: (1) a false misrepresentation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled. *Winn v. Aleda Construction Co.,* 227 Va. 304, 315 S.E.2d 193, 195 (1984). Rule 9(b) of the Federal Rules of Civil Procedure requires that allegations of fraud be stated with particularity. The Court finds that the fraud allegations in plaintiffs' Complaint do not satisfy the requirements of Rule 9(b).

The plaintiffs also allege that as a result of defendants' breach of contract, the plaintiffs have "suffered severe emotional distress." (Complaint, ¶ 71). In *Wise v. General Motors Corp.,* 588 F.Supp. 1207, 1211 (W.D.Va.1984), Judge Williams concluded that the courts of Virginia would hold that there could be no recovery for emotional disturbance in a breach of warranty action unless the breach also caused bodily harm or where serious emotional distress is likely to result. Plaintiffs' Complaint is deficient in that neither bodily harm nor exceptional circumstances where emotional harm is likely have been pled.

22, 1986 to September 7, 1986; November 28, 1986 to December 7, 1986; February 12, 1987 to February 18, 1987; and May 17, 1987 to June 5, 1987. None of these *in vitro* fertilization attempts resulted in pregnancy. Prior to the attempt in May 1987, the plaintiffs signed a form entitled "Informed Consent: Human Pre–Zygotes Cryopreservation" (Cryopreservation Agreement). (Complaint, Ex. B). The consent form outlined the procedure for cryopreservation or freezing of pre-zygotes and detailed the couple's rights in the frozen pre-zygote.

The Cryopreservation Agreement explained that the cryopreservation procedure is available in the event more than five pre-zygotes are retrieved during the IVF treatment. The Agreement further stated that the cryopreservation procedure is intended to reduce the risk of multiple births, while simultaneously "creating additional opportunities for the initiation of pregnancy with the transfer of concepti developed from frozen-thawed pre-zygotes." After signing the Agreement, the plaintiffs underwent the IVF process on May 17, 1987. On May 27, 1987, Dr. Kreiner removed six eggs from Mrs. York and fertilized those eggs with Dr. York's sperm, creating six embryos. On May 29, 1987, five embryos were transferred to Mrs. York's uterus. The remaining embryo, which is the subject of this litigation, was cryogenically preserved in accordance with the procedures outlined in the Cryopreservation Agreement.

In May of 1988, a year after the pre-zygote was frozen, the Yorks sought to have the pre-zygote transferred from the Jones Institute in Norfolk, Virginia to the Institute for Reproductive Research at the Hospital of the Good Samaritan in Los Angeles, California. At the Los Angeles clinic, Dr. Richard Marrs would thaw the embryo and insert it in Mrs. York through *in vitro* fertilization. The plaintiffs consulted two embryologists to arrange for proper cryogenic support in order to successfully transport the embryo. The plaintiffs planned to have Dr. York personally retrieve the embryo from Norfolk and transport it to California by commercial airliner.

The pre-zygote would be housed in a biological dry shipper during the flight.

On May 28, 1988, the Yorks wrote Dr. Muasher and indicated their intent to retrieve and transfer the pre-zygote. By letter dated June 13, 1988, Dr. Muasher, writing on behalf of the Jones Institute, refused to allow such a transfer. On June 18, 1988, Dr. Richard Marrs, on behalf of the Yorks, sought consent to transfer the pre-zygote from physicians at the Jones Institute. By letter dated August 9, 1988, Dr. Jones refused to approve the transfer of the frozen pre-zygote.

### Breach of Contract

The plaintiffs allege that the defendants' continued dominion and control over the frozen pre-zygote is contrary to the language of the Cryopreservation Agreement. (Complaint, Ex. B). The pertinent provision of the Cryopreservation Agreement provides:

We may withdraw our consent and discontinue participation at any time without prejudice and we understand our pre-zygotes will be stored only as long as we are active IVF patients at The Howard and Georgeanna Jones Institute For Reproductive Medicine or until the end of our normal reproductive years. We have the principle responsibility to decide the disposition of our pre-zygotes. Our frozen pre-zygotes will not be released from storage for the purpose of intrauterine transfer without the written consents of us both. In the event of divorce, we understand legal ownership of any stored pre-zygotes must be determined in a property settlement and will be released as directed by order of a court of competent jurisdiction. Should we for any reason no longer wish to attempt to initiate a pregnancy, we understand we may choose one of three fates for our pre-zygotes that remain in frozen storage. Our pre-zygotes may be: 1) donated to another infertile couple (who will remain unknown to us) 2) donated for approved research investigation 3) thawed but not allowed to undergo further development.

The defendants argue that plaintiffs' proprietary rights in the pre-zygote are limited to the "three fates" enumerated in this provision because there is no established protocol for the inter-institutional transfer of pre-zygotes.

■ The Court begins its analysis by noting that the Cryopreservation Agreement created a bailor-bailee relationship between the plaintiffs and defendants. While the parties in this case expressed no intent to create a bailment, under Virginia law, no formal contract or actual meeting of the minds is necessary. *Morris v. Hamilton*, 225 Va. 372, 302 S.E.2d 51, 52 (1983). Rather, all that is needed "is the element of lawful possession however created, and duty to account for the thing as the property of another that creates the bailment...." *Crandall v. Woodard*, 206 Va. 321, 143 S.E.2d 923, 927 (1965). The essential nature of a bailment relationship imposes on the bailee, when the purpose of the bailment has terminated, an absolute obligation to return the subject matter of the bailment to the bailor. 8 Am.Jur.2d *Bailments* § 178 (1980). The obligation to return the property is implied from the fact of lawful possession of the personal property of another. *Id.*

In the instant case, the requisite elements of a bailment relationship are present. It is undisputed that the Jones Institutes' possession of the pre-zygote was lawful pursuant to the Cryopreservation Agreement. The defendants also recognized their duty to account for the pre-zygote by virtue of a paragraph in the Cryopreservation Agreement purporting to disclaim liability for any injury to the pre-zygote.[3] Finally, the defendants consistently refer to the pre-zygote as the "property" of the Yorks in the Cryopreservation Agreement. Although the Cryopreservation Agreement constitutes a bailment contract, the Agreement is nevertheless governed by the same principles as apply to other contracts.

■ The defendants assert that plaintiffs' property interest in the pre-zygote is limited by the Virginia Human Research statute. Va.Code § 37.1–234, *et seq.* Under Virginia law, relevant statutes and regulations existing at the time the contract was made become a part of the contract and must be read into it as if expressly referred to or incorporated. *General Electric Co. v. Moretz*, 270 F.2d 780, 787 (4th Cir.1959), *cert. denied*, 361 U.S. 964, 80 S.Ct. 593, 4 L.Ed.2d 545 (1960). The Human Research statute requires every institution which conducts human research to establish a human research review committee or institutional review board. The statute further provides:

> No human research shall be conducted or authorized by such institution or agency unless (a) such committee has reviewed and approved the proposed human research project giving consideration to ... whether the research conforms with such other requirements as the Board by regulation may establish.... The committee shall require periodic reports from each existing human research project to ensure that it is being carried out in conformity with the proposal as approved....

Va.Code § 37.1–236(B). Defendants assert that the Cryopreservation Agreement contains all of the protocol currently approved by the human research review committee. Conspicuously absent from this protocol is any provision for the inter-institutional

---

**3.** The disclaimer provision in the Cryopreservation Agreement provides:

> We understand that with any technique necessitating mechanical support systems, equipment failure can occur. Neither the Eastern Virginia Medical Authority (EVMA) nor The Howard and Georgeanna Jones Institute For Reproductive Medicine, its directors, employees or consultants are to be held liable for any destruction, damage, misuse or improper testing, freezing, maintenance storage, withdrawal, thawing and/or delivery caused by or re-

sulting from any gross negligence, malfunction of the storage tank, any failure of utilities, any strike, cessation of services, or other labor disturbance, any war, acts of a public enemy, or other disturbance, any fire, wind, earthquake, water, or other acts of God, or the failure of any other laboratory.

> We are advised that EVMA provides no insurance coverage, compensation plan or free medical care plan to compensate us if we or our pre-zygotes are harmed in any way by this cryopreservation procedure.

transfer of cryopreserved human pre-zygotes. Therefore, argue the defendants, because the review committee has not considered or issued guidelines concerning the ethical, medical and legal implications of inter-institutional transfer, the plaintiffs' proprietary interests in the pre-zygote are limited to the three choices for disposition currently recognized in the protocol.

The Court finds that the incorporation of the Virginia Human Research statute into the Cryopreservation Agreement has no affect on the dispute between the parties. The purpose of the Human Research statute is to ensure a complete disclosure of information between the researcher and the subject. The statute envisions that through the legal mechanism of informed consent a human research review committee will promulgate ethical guidelines which protect both scientist and subject from the legal claims of the other.[4] The Court finds that the terms of the statute, when made a part of the Agreement in dispute here, do not conflict with any other terms of the Agreement. The Court further finds that the failure of the human research review committee to consider the ramifications of the inter-institutional transfer of cryopreserved human pre-zygotes does not vitiate the contract between these parties nor does it usurp this Court's jurisdiction to settle a contractual dispute between these parties.

The Court notes the Cryopreservation Agreement should be more strictly construed against the defendants, the parties who drafted the Agreement. *Winn v. Aleda Construction Co.*, 227 Va. 304, 315 S.E.2d 193, 195 (1984). The defendants have defined the extent of their possession interest as bailee of the pre-zygote by the following provision of the Agreement: "We may withdraw our consent and discontinue participation at any time without prejudice and we understand our pre-zygote will be stored only as long as we are active IVF patients at the [Jones Institute]...." The testimony at the hearing on plaintiffs' Motion for Temporary Injunction and the briefs submitted by the plaintiffs make it clear that plaintiffs wish to terminate their relationship with the Jones Institute and continue treatment at the fertility clinic in Los Angeles, California.

■ The defendants have further defined the limits of their possessory interest by recognizing the plaintiffs' proprietary rights in the pre-zygote. The Agreement repeatedly refers to "our pre-zygote," and explicitly provides that in the event of a divorce, the legal ownership of the pre-zygote "must be determined in a property settlement" by a court of competent jurisdiction. The Agreement further provides that the plaintiffs have "the principal responsibility to decide the disposition" of the pre-zygote and that the pre-zygote will not be released from storage without the written consent of both plaintiffs.[5] The Court finds that the inference to be drawn from these provisions of the Cryopreservation

---

**4.** The Ethics Committee of the American Fertility Society has found that an informed consent, [P]rotects the participants in the new reproductive technologies no matter what type of institution or clinic provides the service and no matter whether the procedure is experimental or standard practice.... Informed consent protects patients by giving them the opportunity to refuse treatments that they consider to be too risky....
The Committee also found that,
The provision of information is also key with respect to risks in childbearing. Lawsuits have been brought against physicians by parents of children with genetic defects who claimed that their physicians did not advise them that genetic screening could have been done on them or the developing fetus, which would have given them the option of not giving birth to an affected child.

The Ethics Committee of the American Fertility Society, *Ethical Considerations of the New Reproductive Technologies*, 46 Fertility and Sterility 10s (1986).

**5.** This provision of the Agreement is consistent with the position of the American Fertility Society in their Ethical Statement on *in vitro* fertilization. The American Fertility Society found:
It is understood that the gametes and concepti are the property of the donors. The donors therefore have the right to decide at their sole discretion the disposition of these items, provided such disposition is within medical and ethical guidelines as outlined herein.
The Ethics Committee of the American Fertility Society, *Ethical Considerations of the New Reproductive Technologies*, 46 Fertility and Sterility 89s (1986).

Agreement is that the defendants fully recognize plaintiffs' property rights in the pre-zygote and have limited their rights as bailee to exercise dominion and control over the pre-zygote.

The defendants take the position that the plain language of the Cryopreservation Agreement limits the plaintiffs' proprietary right to the pre-zygote to the "three fates" listed in the Agreement: (1) donation to another infertile couple; (2) donation for approved research; and (3) thawing. The Court finds, however, that the applicability of the three fates is limited by the following language, "Should we [the Yorks] for any reason no longer wish to initiate a pregnancy, we understand we may chose one of three fates for our pre-zygotes that remain in frozen storage." The allegations of plaintiffs' Complaint, and the entire thrust of this litigation, suggest that plaintiffs continue to desire to achieve pregnancy. The Agreement does not state that the attempt to initiate a pregnancy is restricted to procedures employed at the Jones Institute. The "three fates" are therefore inapplicable to the case at bar.

For the reasons stated herein, the Court finds that Count I of plaintiffs' Complaint states a claim upon which relief can be granted. Count II is pled in the alternative alleging an action based on quasi-contract. Accordingly, defendants' Motion to Dismiss Counts I and II are DENIED.

### Detinue

In Count III of the Complaint, plaintiffs allege a cause of action in detinue. The requisite elements of a detinue action in Virginia are as follows: (1) plaintiff must have a property interest in the thing sought to be recovered; (2) the right to immediate possession; (3) the property is capable of identification; (4) the property must be of some value; and (5) defendant must have had possession at some time prior to the institution of the act. *D.T. Vicars v. Atlantic Discount Co.*, 205 Va. 934, 140 S.E.2d 667, 670 (1965). Moreover, if the property is in the possession of a bailee, an action in detinue accrues upon demand and refusal to return the property or upon a violation of the bailment contract by an act of conversion. *Gwin v. H.T.N. Graves*, 230 Va. 34, 334 S.E.2d 294, 297 (1985).

After review of plaintiffs' Complaint, the Court finds that plaintiffs have properly alleged a cause of action in detinue. Accordingly, defendants' Motion to Dismiss Count III is DENIED.

### Eleventh Amendment Immunity

Plaintiffs allege in Count IV of their Complaint that defendants' exercise of dominion and control over the pre-zygote violates their constitutional right to reproductive privacy in violation of the first, fourth, ninth and fourteenth amendments. In the style of their Complaint, plaintiffs allege that the defendant Medical College of Hampton Roads (MCHR) is "an instrumentality of the Commonwealth of Virginia, t/a The Howard and Georgeanna Jones Institute for Reproductive Medicine." Plaintiffs also allege that defendant MCHR is an "arm of the Commonwealth of Virginia." (Complaint, ¶ 100). The defendants argue that plaintiffs' common law diversity counts and the Section 1983 claim are barred by the eleventh amendment.

The Court initially notes that while the language of the eleventh amendment applies only to the state itself, the Supreme Court has extended it to actions where "the state is the real, substantial party in interest." *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 101, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984). The vast majority of courts which have considered the issue have found that state universities enjoy eleventh amendment immunity. *See Kashani v. Purdue University*, 813 F.2d 843, 845 (7th Cir.), *cert. denied*, 484 U.S. 846, 108 S.Ct. 141, 98 L.Ed.2d 97 (1987). Indeed, it seems clear that in Virginia state colleges and universities constitute "arms of the state" for purposes of the eleventh amendment. *See, e.g., Richard Anderson Photography v. Radford University*, 633 F.Supp. 1154, 1158 (W.D.Va.1986), *modified*, 852 F.2d 114 (4th Cir.1988), *cert. denied*, — U.S. ——, 109 S.Ct. 1171, 103 L.Ed.2d 229 (1989); *Sabet v. Eastern Vir-*

*ginia Medical Authority,* 611 F.Supp. 388, 395 (E.D.Va.) (dicta), *aff'd,* 775 F.2d 1266 (4th Cir.1985); *Johnson v. University of Virginia,* 606 F.Supp. 321, 322 (W.D.Va. 1985); *Jacobs v. College of William and Mary,* 495 F.Supp. 183, 189–91 (E.D.Va. 1980); *aff'd,* 661 F.2d 922 (4th Cir.), *cert. denied,* 454 U.S. 1033, 102 S.Ct. 572, 70 L.Ed.2d 477 (1981). Despite this overwhelming trend, the Court is compelled to examine the immunity issue with regard to the facts before it because states may adopt differing schemes with respect to their institutions of higher learning. *See, United Carolina Bank v. Board of Regents,* 665 F.2d 553, 557 (5th Cir.1982).

The United States Court of Appeals for the Third Circuit has recently provided a framework for examining whether an entity is entitled to share in the state's eleventh amendment immunity. *Kovats v. Rutgers, The State University,* 822 F.2d 1303 (3d Cir.1987), *cert. denied,* —— U.S. ——, 109 S.Ct. 1126, 103 L.Ed.2d 188 (1989). The Third Circuit in *Kovats* incorporated the six factors outlined by the Supreme Court in *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 401, 99 S.Ct. 1171, 1177, 59 L.Ed.2d 401 (1979) into the following nine factor inquiry:

> [L]ocal law and decisions defining the status and nature of the agency involved in its relation to the sovereign are factors to be considered, but only one of a number that are of significance. Among the other factors, no one of which is conclusive, perhaps the most important is whether, in the event plaintiff prevails, the payment of the judgment will have to be made out of the state treasury; significant here also is whether the agency has the funds or the power to satisfy the judgment. Other relevant factors are whether the agency is performing a governmental or proprietary function; whether it has been separately incorporated; the degree of autonomy over its operations; whether it has the power to sue and be sued and to enter into contracts; whether its property is immune from state taxation, and whether the sovereign has immunized it-

self from responsibility for the agency's operations.

*Kovats,* 822 F.2d at 1307. The Court will consider these criteria as they apply to the Medical College of Hampton Roads.

The Medical College of Hampton Roads is a public body and governmental instrumentality for the dissemination of education. Va.Code § 23–14 (Supp.1989) MCHR is "a public instrumentality exercising public and essential governmental functions." 1964 Va. Acts Chapter 471 § 3 as amended by 1987 Va.Acts Chapter 329. Moreover, the exercise of the powers granted to MCHR shall be in all respects for the benefits of the citizens of the Commonwealth, and any bond, note, certificate or other evidence of indebtedness is exempt from taxation by the Commonwealth or any political subdivision thereof. 1964 Va. Acts Chapter 471 § 17 as amended by 1987 Va.Acts Chapter 329. While this statutory language strongly suggests that MCHR is an arm of the state, under the *Kovats* decision the inquiry of this Court does not end there.

The most significant factor to be considered for purposes of determining eleventh amendment immunity is whether, in the event plaintiffs prevail, the payment of the judgment will be made out of the state treasury. In *Jacobs,* this Court found that all real and personal property relating to the College of William and Mary is, by statute, the property of the Commonwealth. *Jacobs,* 495 F.Supp. at 189. *See,* Va.Code § 23–40 (1985). Similarly, the court in *Richard Anderson Photography* found that Radford University was entitled to eleventh immunity because state law provided that all of Radford's real and personal property is the property of the Commonwealth. *Richard Anderson Photography,* 633 F.Supp. at 1158 n. 10. *See,* Va. Code § 23–155.3 (1985). The Court finds that in the instant case the real and personal property of MCHR is not the property of the Commonwealth. The Acts of the General Assembly provide:

> The Medical College may acquire property, real or personal, by purchase, gift, devise or by the exercise of the power of

eminent domain, on such terms and conditions, and *in such manner as it may deem proper,* ... and sell, lease, dispose of the same, or any portion thereof or interest therein whenever it shall become expedient to do so.

1964 Va.Acts Chapter 471 § 6 as amended by 1987 Va.Acts Chapter 329 (emphasis added). Moreover, the Commonwealth has insulated itself from liability resulting from any bond or obligation of MCHR.[6]

The Court also finds that MCHR is granted a high degree of autonomy. MCHR is governed by seventeen members, six of whom are appointed by the Medical College of Hampton Roads Foundation, and eleven are appointed by the City Councils of Chesapeake, Hampton, Portsmouth, Suffolk, Newport News, Virginia Beach and Norfolk. 1964 Va.Acts Chapter 471 § 2 as amended by 1987 Va.Acts Chapter 329. None of these members are appointed by the governor, nor do they serve at his pleasure. Furthermore, MCHR is authorized to issue bonds without obtaining the consent of any commission, board, bureau or agency of the Commonwealth. 1964 Va. Acts Chapter 471 § 12 as amended by 1987 Va.Acts Chapter 329. The autonomy of MCHR is further evidenced by its ability to sue and be sued, plead and be impleaded, and to contract and be contracted with. 1964 Va.Acts Chapter 471 § 1 as amended by 1987 Va.Acts Chapter 329.

After considering all of the relevant factors enumerated by the Third Circuit in *Kovats,* the Court concludes that MCHR is not an arm of the Commonwealth entitled to eleventh amendment immunity. Although MCHR is deemed a governmental and public instrumentality, it nevertheless enjoys a high degree of autonomy over both its internal operations and in the dis-

charge of the statutory powers and duties conferred upon it. The Court is satisfied that plaintiffs' judgment, if any, will not be paid from the state treasury. Accordingly, defendants' Motion to Dismiss is DENIED.

IT IS SO ORDERED.

---

**6.** The 1964 Acts, Chapter 471, § 11 as amended by 1987 Acts of Assembly, Chapter 329 provides in pertinent part:

The bonds and other obligations of the Medical College (and such bonds and obligations shall so state on their face) shall not be a debt of the Commonwealth or any political subdivision thereof and neither the Commonwealth nor any political subdivision thereof other than the Medical College shall be liable thereon, nor shall such bonds or obligations be payable out of any funds or properties other than those of the Medical College. The bonds shall not constitute an indebtedness within the meaning of any debt limitation or restriction.