636 A.2d 176

**David and Sayde LADOV, Individually And As Administrators of the Estate of Baby Girl Ladov, Deceased, Appellants,**

v.

**Pamela SKRENTNER, M.D., John T. Bennett, M.D. & Montgomery Hospital Medical Center, Appellees.**

Superior Court of Pennsylvania.

Argued Oct. 7, 1993.

Filed Jan. 7, 1994.

154

David A. Yanoff, Philadelphia, for appellants.

L. Rostaing Tharaud, Philadelphia, for Montgomery Hosp., appellee.

Before POPOVICH, JOHNSON and HOFFMAN, JJ.

POPOVICH, Judge.

We are asked to review the August 16, 1991, order of the Court of Common Pleas of Montgomery County granting the preliminary objections in the nature of a demurrer against the plaintiffs/appellants, David & Sayde Ladov, Individually and as Administrator of the Estate of Baby Girl Ladov, Deceased. We reverse.

 Where there is a challenge to the sustaining of a preliminary objection in the nature of a demurrer, an appellate court's scope of review is limited. The standard of review was reiterated in *Mahoney v. Furches*, 503 Pa. 60, 468 A.2d 458, 461 (1983):

All material facts set forth in the complaint as well as all inferences reasonably deducible therefrom are admitted as true for [the purpose of this review.] The question presented by the demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible. Where a doubt exists as to whether a demurrer should be sustained, this doubt should be resolved in favor of overruling it. [Citations omitted]

Viewing the record in this light, we find that a civil action was commenced on June 19, 1990, by the issuance of a summons upon the appellees/defendants, Pamela Skrentner, M.D.,

Montgomery Hospital Medical Center and John T. Bennett, M.D. A rule to file was followed by a six-count complaint alleging medical malpractice in the defendants' failure to provide medical care preventing the premature birth (after 21 weeks gestation) of the plaintiffs' Baby Girl Ladov, who "survived for several hours" prior to expiring in the defendant/Hospital's nursery.

More specifically, Counts I and II consisted of survival and wrongful death actions, respectively, consisting of twenty-four allegations (subparagraphs (a)–(x)) of negligence on the part of the defendants resulting in the "decedent ... suffer[ing] ... during ... her ... short lifetime" (Count I, Paragraph 30) and the "[P]laintiffs ... incur[ring] ... medical and administration expenses" (Count II, Paragraphs 35 & 36), as well as losing the pecuniary contribution and value of the decedent. *Id.*

Count III asserted the infliction of "severe emotional distress occasioned by defendant[s'] outrageous conduct...." resulting in the plaintiff/Sayde Ladov's loss of earnings. Count IV averred the identical twenty-four instances of negligence recited in Counts I & II as the basis for a claim sounding in medical malpractice resulting in emotional distress affecting numerous aspects of the plaintiff/Sayde Ladov's life, e.g., loss of earnings and expenditure of money. Counts V & VI contended the loss of spousal and falial consortium, respectively, by the plaintiffs.

Preliminary objections were filed by the defendants, Doctors Skrentner and Bennett, in the nature of a Motion to Strike portions of Paragraphs 27, 33 & 35 for not complying with Pa.R.Civ.P. 1019(a) (not pleading with specificity), the complaint as a whole was "legally insufficient" and in the nature of a demurrer as to Counts III (for failing to state a cause of action for intentional and/or negligent infliction of emotional distress) & VI (loss of consortium of minor plaintiff).

Likewise, the defendant/Hospital filed preliminary objections in the nature of a demurrer as to Counts I & II on the strength of *Hudak v. Georgy*, 390 Pa.Super. 14, 567 A.2d 1095

(1989), appeal granted, 525 Pa. 600, 575 A.2d 566 (1990),[1] which held the non-recognition of wrongful death and survival actions in the case of a fetus, although born alive, concededly not viable at the time of birth. Demurrer and/or motion to strike were filed as to Counts III, IV & VI.

After oral argument and the submission of briefs, the court issued two orders dated August 16, 1991: The first granted the defendant/Hospital's demurrer to Counts I, II, III (as to negligent infliction of emotional distress only) and VI [2]; the second granted the defendants/Skrentner & Bennett's demurrer to Counts III (as to negligent infliction only) & VI.[3] This appeal followed and alleges that the court erred in granting the defendant/Hospital's preliminary objections in the nature of a demurrer as to Counts I & II. See Appellant's Brief at 4.

Preceding our inquiry into the merits of the claims raised, we need to decide whether the order appealed is interlocutory.[4] In *Praisner v. Stocker*, 313 Pa.Super. 332, 459 A.2d 1255 (1983), this Court, sitting en banc, held:

As a general rule, an order dismissing some but not all counts of a multi-count complaint is interlocutory and not appealable.

* * * * * *

However, the general rule is not without exceptions. Certain orders which have not put a litigant literally "out of court" or completely terminated the litigation have nevertheless been held to possess sufficient aspects of finality to be appealable immediately because the effect of the order

1. As discussed more fully infra, our Supreme Court has reversed this Court in *Hudak*, supra, at 535 Pa. 152, 634 A.2d 600 (1993).

2. As explained by the court in its opinion at page 5–7, a typographical error in the initial order inverted the Roman numerals so as to read that the defendant/Hospital's demurrer as to Count IV had been granted, when in truth it was Count VI.

3. See note 1, supra.

4. Because the instant lawsuit commenced by writ of summons dated June 19, 1990, the amendments to Pa.R.App.P. 341 (effective July 6, 1992) have no impact in our resolution of whether the December 16, 1991, order is final for appeal purposes. See *Bell v. State Farm Ins. Co.*, 430 Pa.Super. 435, 634 A.2d 1137 (1993).

has been to preclude the litigant from asserting the cause of action alleged.

\* \* \* \* \* \*

Where separate and distinct causes of action have been joined under permissive joinder standards of Pa.R.C.P. 1020(a) or Pa.R.C.P. 1044(a), the appealability of a judgment entered on one or more but not all counts must be distinguished from the situation in which separate counts have been used to slate alternate theories for recovery on the same cause of action. In the former situation the [order] has terminated litigation upon a separate and distinct cause of action. In the latter, an order dismissing or entering judgment on one or more but not all counts of a complaint is interlocutory, for the plaintiff can, nevertheless, proceed to a determination on the underlying cause of action. \* \* \* [I]t is procedurally preferable to delay appellate review until the entire action has been determined.

313 Pa.Super. at 336–39, 340–41, 459 A.2d at 1258–59, 1260 (Citations omitted).

More particular, as stated on this point by our Supreme Court in *Sweener v. First Baptist Church of Emporium, Pa.,* 516 Pa. 534, 533 A.2d 998, 1000 (1987):

"The finality of an order is a judicial conclusion which can be reached only after an examination of its ramifications." With regard to summary judgment[/preliminary objections], it is well established that an order *denying* a motion for summary judgment is interlocutory and therefore not normally appealable. It is equally clear, however, that an order *granting* a defendant's motion for summary judgment [/preliminary objections] may in some cases not terminate litigation regarding recovery of other separate and distinct losses claimed against the same defendant . . ., or as to claims asserted against other defendants. . . .

A pivotal consideration in determining whether an order is final and appealable is whether the plaintiff aggrieved by it has, for purposes of the particular action, been put "out of court" on all theories of recovery asserted against a given

defendant for a given loss. [Citations omitted; emphasis in original]

See also *Dash v. Wilap Corp.*, 343 Pa.Super. 584, 495 A.2d 950, 954 (1985).

■ In the present case, the preliminary objections in favor of the defendant/Hospital had the practical effect of terminating litigation regarding recovery of other losses claimed ("wrongful death and survival actions") against the same defendant, but separate and distinct from the other claims/counts listed in the complaint.[5] In short, the grant of the preliminary objections put the appellants "out of court" insofar as any possibility of recovering against the defendant/Hospital for causes of action sounding in wrongful death and survival, notwithstanding the fact that the same two counts are extant as to the defendants/Drs. Skrentner & Bennett. See *Sweener*, supra; *Dash*, supra.

■ Accordingly, we hold that the appellants' appeal of the August 16, 1991, order granting the defendant/Hospital's preliminary objections is final. However, to the extent the defendants/Drs. Skrentner & Bennett attempt to piggy-back onto the Hospital's presentment of preliminary objections as to Counts I & II, we find that the Doctors' failure to file their *own* preliminary objections to Counts I & II renders the matter they seek to defend against before us waived for appeal purposes. See Pa.R.App.P. 302(a); *Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 322 A.2d 114 (1974).

We next turn to the appellants' argument that the court's grant of the defendant/Hospital's preliminary objections on the ground that *Hudak*, supra, precludes the allowance of a

5. Counts I & II (Wrongful death and survival actions) against the Hospital reflect separate statutory causes of action, the former is brought on behalf of the spouse, children or parents of the decedent (42 Pa.C.S.A. § 8302) while the latter is filed on behalf of the decedent's estate (*Id.* at § 8301). Therefore, the order dismissing Counts I & II was a final and appealable order since the damages sought were on *different* causes of action in contradistinction to separate counts being used to state alternate theories to support recovery on the *same* cause of action. See *Cloverleaf Development, Inc. v. Horizon Financial FA*, 347 Pa.Super. 75, 500 A.2d 163 (1985).

wrongful death and survival action (where a fetus is, albeit allegedly born alive, admittedly not viable at the time of birth) should not be followed as an "aberrational" decision, singularly holding to the contrary of the majority view. We do not agree but reverse for the reasons advanced by our Supreme Court in *Hudak v. Georgy*, 535 Pa. 152, 634 A.2d 600, (1993).

Mrs. Hudak was found to be pregnant with triplets in late 1982. By April of 1983, she alerted her doctors that she was experiencing cramps. One of her doctors advised that she go to the hospital where her other physician was on duty. Upon arrival, her second physician administered medication to stop her contractions. With her condition under control, Hudak was transferred to another hospital where treatment was administered by doctors other than her own. The following day, Hudak gave birth by caesarean procedure. Two of the fetuses were supposedly born alive, but died within minutes of birth. The third, also allegedly born alive, died the next day.

Wrongful death and survival actions were filed, *inter alia*, against the doctors in unduly delaying in treating Hudak and that this caused the fetuses to die. The defendant/doctors sought dismissal on the basis that Pennsylvania did not recognize a cause of action for wrongful death and survival in the case of non-viable fetuses. Also, the parties stipulated that the fetuses were non-viable at the time of birth, i.e., incapable of living outside the womb because of immaturity.

At the outset, this Court noted no pronouncement of Pennsylvania law directly on point, finding that *Amadio v. Levin*, 509 Pa. 199, 501 A.2d 1085 (1985) and *Sinkler v. Kneale*, 401 Pa. 267, 164 A.2d 93 (1960) dealt with full-term births and the Legislature, in its enactment of the Wrongful Death and Survival statutes, failed to elaborate on the meaning of the phrase "natural person" or "individual". In conclusion, the *Hudak* Court wrote:

> This summary of the pertinent decisions reveals that we are in uncharted seas. We have no expressions of legislative intent on which to rely, nor do we have guidance from the Supreme Court. Given the nature of the issue before

us, we conclude that it is up to the legislature to create the cause of action. In the absence of any expression of intent for the legislature or any analysis by our Supreme Court, we cannot decide that fetuses born prior to attaining viability should now be accorded the same rights that children who have attained viability have been accorded under the Wrongful Death and Survival Acts. As Chief Justice Nix wrote in his dissent to *Amadio:*

> It is a cardinal principle that fundamental public policy should be ascertained and articulated through legislative fiat and not through judicial edict. For illustration, the majority appears to assign this "new cause of action" based upon the viability of the fetus. This option in favor of viability as opposed to conception touches upon one of the most controversial questions of our day. Clearly, disputes of this nature cannot satisfactorily be resolved by court decisions.

*Id.* 509 Pa. at 235–36, 501 A.2d at 1104 (Nix, C.J., dissenting). *See also Id.* at 238, 501 A.2d at 1105 (Hutchinson, J., dissenting ( . . . the majority incorrectly ventures into policy areas more properly left to the legislature. . . .); *Toth v. Goree,* 65 Mich.App. 296, 237 N.W.2d 297 (1975) (court refuses to extend wrongful death right of action to stillborn non-viable fetus on ground that to do so would be usurpation of legislative function).

We, therefore, affirm the trial court's dismissal of appellants' [/parents'] wrongful death and survival actions.

390 Pa.Super. at 20–21, 567 A.2d at 1098. Contrast *McCaskill v. Philadelphia Housing Authority,* 419 Pa.Super. 313, 615 A.2d 382 (1992) (A wrongful death and survival action cannot be maintained on behalf of a fetus which spontaneously aborted at seventeen weeks of gestational age); *Coveleski v. Bubnis,* 391 Pa.Super. 409, 571 A.2d 433 (1990), appeal granted, 525 Pa. 656, 582 A.2d 323 (1990) (No cause of action for wrongful death and survival for eight-week-old fetus aborted to avoid fetal damage because of vehicle accident involving

mother); [6] *Askew v. Cruciani,* 149 Pa.Cmwlth. 397, 613 A.2d 147 (1992) (No wrongful death and survival action could be filed on behalf of one of ten-week-old twin fetuses who died as a result of motor vehicle accident involving mother).

The appellants attempt to distinguish *Hudak* and *Coveleski,* arguing that the initial case dealt with the parties conceding non-viability and the second dealing with an admittedly non-viable fetus given its gestational age. Such being the case, the appellants argue that they do not "concede" non-viability nor is this impliedly evident in their complaint at paragraph 19, wherein it is averred that the fetus was approximately 21 weeks old at the time of the caesarean. The court below has seized upon this maturity date in concluding that:

> The Superior Court has defined "viability" as that 'stage of development at which the fetus would be capable of independent existence if removed from its mother's womb, and it has often been noted that a fetus ordinarily becomes viable during the sixth or seventh month of its mother's pregnancy.'
>
> *Coveleski v. Bubnis,* [supra,] 391 Pa.Super. [at] 413, 571 A.2d [at] 435. . . .
>
> In the case at bar, no factual issue regarding viability exists, as plaintiffs have admitted in Paragraph 19 of their Complaint that the gestation period of their fetus was only 21 weeks, or approximately five months. In light of *Hudak,* plaintiffs have failed to state a cause of action for wrongful death and survival of their baby girl.

Opinion, 5/27/93 at 4. The appellants counter, but miss the mark in light of our Supreme Court's decision in *Hudak,* supra, that:

> Viability remains an amorphous concept, its quantitative definition subject to advances in medical science and technology and its application in the case of any particular fetus being dependent upon various factors, no one of which, including gestational age, can be considered dispositive.

6. Affirmed at 535 Pa. 166, 634 A.2d 608 (1993) (viability is critical where there is not a live birth).

*See, e.g., Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 65, 96 S.Ct. 2831, 2839, 49 L.Ed.2d 788 (1976). Thus, while the United States Supreme Court in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), opined that viability was usually placed at about 28 weeks ..., *Id.* [410 U.S. at 159], 93 S.Ct. at 730—more recent cases have cited a period of 23 to 24 weeks, again with an explicit recognition that it may occur earlier. *Planned Parenthood v. Casey,* —— U.S. —— [——], 112 S.Ct. 2791, 2811, 120 L.Ed.2d 674 (1992).

Indeed, numerous respected reference sources recognize "viability" at a point prior to that at which the Ladovs' deceased daughter was born. *See, e.g., Stedman's Medical Dictionary, 5th Unabridged Lawyers' Edition* (Anderson Publishing Company 1982), defining viability as "capability of living; the state of being viable; *usually connotes a fetus that has reached 500 g. in weight and 20 gestational weeks.*" (emphasis added). The diverse views in the medical literature regarding the "point" of viability highlight the impossibility of including within any definition of the term a rigidly fixed component of gestational age. As noted in a standard obstetrical text:

The term "viable" is widely used to identify a reasonable potential for subsequent survival if the fetus were to be removed from the uterus. Termination of a pregnancy before term but after the fetus has achieved some potential for survival is referred to as premature delivery of a premature infant. The gestational age at which the fetus upon delivery ceases to be an abortus and becomes an infant is most difficult to define. *In many states, a birth certificate is prepared for any pregnancy at 20 weeks gestational age or more, or for any fetus that weights 500 g. or more.*

*Williams Obstetrics,* Ch. 23, p. 483 (J. Pritchard & P. McDonald, 15th Ed.1976) (emphasis added).

In sum, there is no consensus within the medical community as to the precise gestational age at which "viability" of a fetus occurs. *Planned Parenthood Association v. Fitz-*

*patrick,* 401 F.Supp. 544 [554], 570 (D.D.C.1975), *affirmed,* 428 U.S. 901, 96 S.Ct. 3202, 49 L.Ed.2d 1203 [1205] (1976). It is for precisely this reason, and in recognition of the fact that "the time when viability is achieved may vary with each pregnancy" (*Planned Parenthood of Central Missouri v. Danforth, supra.,* 428 U.S. at 64, 96 S.Ct. at 2839), that the authoritative legal definitions of the term "viability" have consistently refrained from espousing a precise quantitative delineation of term when medical science has been unable to do so. As recognized by the United States Supreme Court in *Roe v. Wade:*

> When those trained in the respected disciplines of medicine, philosophy, and theology are unable to arrive at any consensus the judiciary, at this point in the development of man's knowledge, is not in a position to speculate as to the answer.

*Id.,* 410 U.S. at 159, 93 S.Ct. at 730.

Appellants' Brief at 43–45 (Emphasis in original).

Our Supreme Court's recent pronouncement in *Hudak, supra,* holds that "viability" is not a "critical" element, save where there is not a live birth, in permitting the commencement of a wrongful death and survival action. Specifically, the Court wrote:

> In *Amadio,* we did not eliminate a cause of action for wrongful death brought on behalf of an infant that only survives a moment. Indeed we stated, "[t]oday's holding merely makes it clear that the recovery afforded the estate of a stillborn is *no different* than the recovery afforded the estate of a child that dies within seconds of its release from its mother's womb." *Amadio v. Levin,* 509 Pa. 199, 207, 501 A.2d 1085, 1089 (1985) (emphasis added). The Supreme Court, by couching the issue in terms of whether infants born alive "should now be accorded the same rights [as] children who have attained viability," has turned our decision in *Amadio* on its head. The issue was not whether the viability standard should supplant live birth as the only relevant measure of when a fetus becomes a person, but whether a viable stillborn fetus should be treated the same

as a child born alive. Therefore, *Amadio* did not affect the rule permitting a wrongful death action for a child that is born alive.

, Moreover, interjecting the concept of viability into a situation where a child born alive confuses the issue. Viability described the capacity of the unborn to survive outside the womb, and is not relevant when an infant survives birth.[3] Not surprisingly, no jurisdiction accepts the ... assertion that a child must be viable at the time of birth in order to maintain an action in wrongful death. Indeed, the ... argument that viability rather than live birth is the dispositive consideration in determining the existence of an action for wrongful death has been rejected.

The ... argument that the immaturity of the Hudak triplets operates to bar recovery is also inconsistent with the Second Restatement of Torts. Section 869 provides:

§ 869 Harm to Unborn Child

(1) One who tortuously causes harm to an unborn child is subject to liability to the child for the harm if the *child is born alive.* . . . (emphasis added).

\* \* \* \* \* \*

This case does not attempt to address the issue of whether there is a point in time, prior to birth, when a fetus becomes a person for purposes of our wrongful death and survival acts. *See, Coveleski v. Bubnis,* 535 Pa. 166, 634 A.2d 608 (1993). Rather, *today we are reaffirming the unremarkable proposition that an infant born alive is, without qualification a person. Since live birth has always been and should remain a clear line of demarcation, an action for wrongful death and survival can be maintained on behalf of the Hudak triplets.*

[3] The determination of viability becomes critical when there is not a live birth. Today in *Coveleski v. Bubnis,* 535 Pa. 166, 634 A.2d 608 (1993), we determined that a wrongful death cause of action does not lie for the demise of an eight week old fetus. It could be argued that it is inconsistent to treat the "non-viable" triplets differently than a non-viable eight week fetus. However, any apparent inconsistency proceeds from the fallacy that a child born alive can be described in terms of viability.

535 Pa. at 156 & n. 3, 634 A.2d at 603 & n. 3 (Emphasis added in part).

■ As is evident from the *Hudak* ruling, our Supreme Court made it clear that "viability" is not a prerequisite to a wrongful death and survival action. Rather, the cornerstone for permitting such a suit to persist is evidence (re: an "allegation" of birth where we are at the pleading stage) that the child was born "alive", even though it may have survived but for a "moment" before expiring. The rationale being that, in a wrongful death and survival action, a suit may be brought on behalf of a child born alive because he/she is considered a "natural person". And, we are not to be preoccupied with whether the infant is viable/non-viable at the time of death, except in those instances, which is not the case here, where the child is not born alive. See *Coveleski v. Bubnis*, 535 Pa. 166, 634 A.2d 608 (1993).

Lastly, we would respond to those who might argue that the allowance of a suit such as the present (on behalf of a premature birth that is unable to survive outside the womb— either on its own or through artificial means) will open the flood-gates to medical malpractice suits rendering obstetric care less accessible than in the past for fear of liability on the part of the health-care provider, we would echo the remarks of Justice Montemuro, the author of the 4–2 decision in *Hudak*,[7] that such argument rings hollow upon examination; to-wit:

> The Doctors assert that permitting recovery on behalf of "non-viable" children born alive will lead to limitless liability. Specifically, the Doctors argue that both physicians and parents would be potentially liable to the estate of an aborted fetus that is born alive. This argument is specious. Liability for wrongful death only attaches to injuries caused by the "wrongful act or neglect or unlawful violence or negligence of another." 42 Pa.C.S.A. § 8301. Certainly, a woman undertaking an act protected by the Constitution, or

7. Justice Larsen did not participate in the decision of the case.

a physician performing a lawful act, would not come within the scope of liability.

535 Pa. at 156, 634 A.2d at 603.

■ Consistent with our Supreme Court's ruling in *Hudak*, we hold that the court below erred in predicating its grant of the appellee's preliminary objections on the fact that Baby Girl Ladov, although born alive and surviving several hours after birth, was not "viable". Such a determination is in violation of *Amadio*, supra, which has been reaffirmed and *clarified* for those who believed, wrongly, that "viability" was the benchmark against which a wrongful death and survival action turned, despite the fact that a live birth had occurred but was short-lived. See *Hudak*, supra.

Thus, in accordance with the dictates of *Hudak*, we reverse the order of the court below and remand for this case to proceed to resolution.

Order reversed, case remanded, and jurisdiction is not retained.

JOHNSON, J., files a concurring statement.

JOHNSON, Judge, concurring.

The sole issue on this appeal is whether the distinguished trial court, which adhered to our decision in *Hudak v. Georgy*, 390 Pa.Super. 14, 567 A.2d 1095 (1989), must now be reversed following the filing of our supreme court's decision in the same appeal on November 16, 1993. *Id.*, 535 Pa. 152, 634 A.2d 600 (1993). In the appeal now before us, the Honorable Paul W. Tressler recognized and acknowledged, at the time of filing his trial court Opinion pursuant to Pa.R.A.P. 1925, that the Superior Court decision in *Hudak* was subject to reversal and that if so reversed, those portions of his decision and Opinion based upon this Court's decision in *Hudak* would be in error.

A majority of our supreme court has now held that "a child that is born alive is a natural person for purposes of our wrongful death and survival acts even if the infant is consid-

ered non-viable at the time of its birth." *Id.*, at 155, 634 A.2d at 602.

Lacking the perspicacity of my esteemed colleagues, I can only agree that Judge Tressler's order must be reversed, as that distinguished judge has already conceded, and the case remanded for further proceedings not inconsistent with the most recent pronouncements of our supreme court.