121 P.3d 1256

Belinda L. JETER, a married woman;
William R. Jeter, a married man,
Plaintiffs–Appellants,

v.

MAYO CLINIC ARIZONA d/b/a Mayo
Clinic Scottsdale and/or Center for Re-
productive Medicine, an Arizona corpo-
ration, Defendant–Appellee.

No. 1 CA–CV 04–0048.

Court of Appeals of Arizona,
Division 1, Department E.

Oct. 27, 2005.

388

Levenbaum & Cohen by Geoffrey M. Trachtenberg, Phoenix, Attorneys for Plaintiffs–Appellants.

Snell & Wilmer L.L.P. by Daniel J. McAuliffe, Barry D. Halpern, GinaMarie Slattery, Stephanie V. Hackett, Phoenix, Attorneys for Defendant–Appellee.

## OPINION

KESSLER, Judge.

¶1 Belinda and William Jeter ("the Jeters") appeal from the dismissal of their lawsuit against the Mayo Clinic Arizona doing business as Mayo Clinic Scottsdale and/or the Center for Reproductive Medicine ("Mayo"). The Jeters sued Mayo for the alleged negligent destruction or loss of five of the Jeters' frozen human pre-implantation embryos or pre-embryos,[1] which Mayo agreed to cryopreserve and store.

¶2 The superior court held the Jeters had failed to state a claim upon which relief could be granted and dismissed their wrongful death claim because the pre-embryos were not "persons" under Arizona's wrongful death statutes, Arizona Revised Statutes ("A.R.S.") sections 12–611 to –613 (2003). It also held Arizona did not recognize the Jet-

---

1. The Jeters referred to the fertilized human eggs at issue in this case as "embryos." The word "embryo" comes from the Greek "embryon," which has been variously translated as "thing newly born" and "young of any organism in an early stage of development." Lars Noah, *A Postmodernist Take on the Human Embryo Research Debate*, 36 Conn. L.Rev. 1133, 1152 (2004) ("Noah"). *See also* Jane Maienschein, *Whose View of Life? Embryos, Cloning and Stem Cells* at 25 (2003) ("Maienschein") (explaining that the word may have derived from the terms "em" and "bryein," meaning a "swelling inside").

Use of the term "embryo" in this context is highly charged because of the discussion among ethicists, scientists, philosophers and the public generally about when a society should consider a human life to begin. Referring to a cryopreserved three-day old fertilized human egg as an embryo can imply that the egg is a "person". The word that is used to describe the egg may significantly affect one's perception of when life begins. Louis M. Guenin, *On Classifying the Developing Organism*, 36 Conn. L.Rev. 1115, 1121–30 (2004) ("Guenin"); Noah at 1152–54. *See also Davis v. Davis*, 842 S.W.2d 588, 594 (Tenn.1992)(on issue of status of in vitro pre-

embryos, semantical distinctions are significant because language can confer legal status and inaccuracy can lead to misanalysis). Thus, while one view is that an embryo comes into existence at conception, many scientists and ethicists posit that a fertilized human egg is not an embryo until at least uterine implantation and two weeks of development. Ann A. Kiessling, *What is an Embryo*, 36 Conn. L.Rev. 1051, 1088–89 (2004) ("Kiessling"); Noah at 1133, 1138–52; Maienschein at 260–61. A number of ethicists and scientists have developed different names for human eggs fertilized outside the womb and not implanted in a womb, including "proto-embryo," "pre-implantation embryo" and "pre-embryo." Kiessling at 188–89; Noah at 1138, 1147–54.

Analytically, it is not the name but the biological details of development that should help guide the discussion of when to consider that life begins. Maienschein at 260–61. Our analysis necessarily relies on the nature of embryonic development rather than a label. To avoid entering into the emotional discussion about when life begins, in this opinion we use the term "pre-embryo." Our use of that term is meant to be neutral and not meant to demean or minimize the special respect which the Jeters and others claim for such fertilized, unimplanted eggs.

ers' claim for negligent loss of irreplaceable property. The court further rejected the Jeters' breach of fiduciary duty and breach of bailment contract claims as barred by Arizona's Medical Malpractice Act, A.R.S. §§ 12–561 to –594 (2003 & Supp.2004).

¶3 For the reasons discussed below, we affirm the superior court's dismissal of the wrongful death claim and hold that absent legislative action expanding the wrongful death statutes, as a matter of law, a cryopreserved, three-day old fertilized human egg is not a "person" for purposes of that statute. However, we reverse the dismissal of the other three claims and remand for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 Since the complaint was dismissed at the pleading stage for failure to state a claim, we review the well-pleaded facts alleged in the complaint as true. *Shannon v. Butler Homes,* 102 Ariz. 312, 315, 428 P.2d 990, 993 (1967) (court will accept as true only well-pleaded facts). However, we do not accept as true allegations consisting of conclusions of law, inferences or deductions that are not necessarily implied by well-pleaded facts, unreasonable inferences or unsupported conclusions from such facts, or legal conclusions alleged as facts. *Id.; Dockery v. Central Ariz. Light and Power Co.,* 45 Ariz. 434, 439, 45 P.2d 656, 658 (1935) (only well-pleaded facts accepted as true, not inferences that are not necessarily implied by such facts); *Kellogg v. Nebraska Dep't of Corr.,* 269 Neb. 40, 690 N.W.2d 574, 578 (2005) (court will ignore legal conclusions in form of factual allegations).

¶5 The Jeters went to Mayo for information on medical procedures that would assist them in conceiving a child. Mayo offered certain services for harvesting, storing and implanting pre-embryos, including in vitro fertilization. With the consent of the Jeters, Dr. Anita Singh at Mayo retrieved or harvested multiple eggs from Belinda Jeter, which were fertilized in vitro (outside Mrs. Jeter's womb) with William Jeter's sperm. The resulting zygotes were permitted to progress through several divisions in the laboratory over a period of forty-eight to seventy-two hours, developing from single-cell organisms to two- to eight-cell organisms. While the Jeters' complaint refers to these fertilized eggs as "viable embryos," such a characterization is a conclusion that is not necessarily implied from the well-pleaded facts. Pursuant to a written consent form, Mayo and the Jeters agreed to have Mayo cryopreserve and store the pre-embryos.[2]

¶6 Belinda Jeter underwent two unsuccessful non-surgical in vitro fertilization procedures at Mayo attempting to implant the pre-embryos into her womb. The Jeters then began looking at alternative procedures.

¶7 The Jeters decided to utilize the services of Dr. Jay Nemiro at the Arizona Center for Fertility Studies Ltd. ("Arizona Center"). Dr. Nemiro offered them an alternative procedure called a tubal embryo transfer. A tubal embryo transfer also requires initial egg retrieval and fertilization of the eggs in a laboratory. Unlike the procedures at Mayo, however, in a tubal embryo transfer the physician injects the pre-embryos into a woman's fallopian tube(s) during a laparoscopy, enabling them to reach the uterus via their biological route.

¶8 The Jeters made arrangements to personally transfer their ten remaining cryopreserved pre-embyros from Mayo to the Arizona Center, obtaining proper storage equipment and arranging for delivery to the Arizona Center. The Jeters executed a transfer request form, obtaining Mayo's release of the remaining cryopreserved pre-embryos in four labeled straws.

---

**2.** Cryopreservation is a process that freezes the pre-embryos in liquid nitrogen and delays further cellular development so that they may be used at a later date. Because the process of harvesting and fertilizing eggs is expensive, cryopreservation permits couples to "bank" them so they can attempt more than one transfer if an initial implantation is unsuccessful or the initial transfer is successful but the couple wishes to have additional children. During cryopreservation, the pre-embryos are stored in cryotubes (or "straws") and remain frozen until thawed for subsequent use. President's Council on Bioethics, *Reproduction and Responsibility—The Regulation of New Biotechnologies* at 29–30 (March 2004) ("PCB").

¶ 9 The Jeters alleged they transferred the pre-embryos to the Arizona Center. Belinda Jeter then went to the Arizona Center for a tubal embryo transfer. Before the surgical implantation, the doctor told her that two of the four straws did not contain, and had never contained, any embryonic matter. If this is accurate, Mayo had actually produced only five of the Jeters' ten remaining pre-embyros. Mayo failed to account for the allegedly missing pre-embryos.

¶ 10 The Jeters proceeded with the tubal embryo transfer at the Arizona Center with the five remaining pre-embryos. The procedure was successful and Belinda Jeter conceived and delivered a daughter. However, the Jeters would like to have more children and now must undergo the additional discomfort and cost of harvesting and fertilizing more eggs. In addition, the Jeters remain concerned about the fate of the allegedly missing pre-embryos, wondering whether Mayo lost or destroyed them or whether Mayo may have given them to the wrong people, resulting in the birth of one or more of the Jeters' biological children to another woman.

¶ 11 The Jeters sued Mayo alleging four claims. Count One asserted a claim for "Negligence—Loss of Potential Children" under Arizona's wrongful death statutes. Count Two asserted a claim for "Negligence—Loss of Irreplaceable Property." Under that count, the Jeters alleged Mayo had breached its duty to store and safeguard the fertilized eggs. Count Three asserted a claim for "Breach of Fiduciary Duty," alleging that, because the organisms were "potentially viable human beings, their custody was entitled to 'special respect' and [the] highest standards of care." Finally, Count Four asserted a claim for breach of a bailment contract.

¶ 12 Mayo moved to dismiss the complaint for failure to state a claim, arguing as to Count One that the cryopreserved three-day old, eight-cell pre-embryos were not "persons" under the Arizona wrongful death statutes. Mayo further asserted as to Count Two that Arizona did not recognize a claim for loss of irreplaceable property. As to

Count Three, Mayo argued that the medical malpractice act barred the claim for breach of fiduciary duty because it was not an enumerated cause of action against a health care provider allowed by that act. Finally, as to Count Four, Mayo asserted that A.R.S. § 12–562(C) (Supp.2003) barred the breach of bailment contract claim because there was no written bailment contract between the parties as required by that statute.

¶ 13 The Jeters opposed the motion, asking the court to recognize the first two causes of action and to hold the medical malpractice act unconstitutional if it abrogated their claims. They also contended they had a written bailment contract with Mayo.

¶ 14 The superior court granted Mayo's motion, holding:

The Court specifically finds that the wrongful death statute does not provide relief for frozen cell embryos and that the same are not "persons."

The Court also specifically finds that there is no common law cause of action in Arizona for the alleged negligent loss of viable human embryos.

And lastly, the Court finds that the Arizona medical negligence (malpractice) act is not unconstitutional.

¶ 15 The Jeters moved for partial reconsideration and clarification of the ruling. They asked the court to reconsider its holding that Arizona did not recognize a common law cause of action for negligent loss of irreplaceable property. They further asked the court to clarify its ruling as to their claim for breach of bailment contract, asserting they had shown they had a written contract with Mayo.

¶ 16 The superior court denied the motion for reconsideration. The court noted that perhaps the third paragraph of its prior minute entry (regarding the constitutionality of the medical malpractice act) could be removed but stated that this "entire 'subject' needs to be handled by the Appellate Courts and/or Legislature." The court entered judgment granting Mayo's motion to dismiss, and the Jeters timely filed this appeal.[3]

3. Mayo initially filed a notice of cross-appeal contesting the superior court's denial of its mo-

## ISSUES

¶ 17 The Jeters argue the superior court improperly dismissed their complaint because: (1) the Jeters' cryopreserved pre-embryos were "persons" under the Arizona wrongful death statutes; (2) Arizona recognizes a cause of action for the negligent loss or destruction of the cryopreserved pre-embryos; (3) to the extent A.R.S. §§ 12–561(1) and –562(A) bar the Jeters' claims for breach of fiduciary duty and breach of bailment contract, those statutes are unconstitutional; and (4) the Jeters adequately pled the existence of a written bailment contract as required by A.R.S. § 12–562(C).

## DISCUSSION

### I.   Jurisdiction and Standard of Review

■■■ ¶ 18 We have jurisdiction over this appeal pursuant to A.R.S. § 12–2101(B) (2003).  We review de novo an order dismissing a complaint for failure to state a claim.  *Fairway Constr., Inc. v. Ahern*, 193 Ariz. 122, 124, ¶ 4, 970 P.2d 954, 956 (App.1998).  We will affirm such a dismissal only if "satisfied as a matter of law that plaintiffs would not be entitled to relief under any interpretation of the facts susceptible of proof."  *Fidelity Sec. Life Co. v. State of Arizona Dep't of Ins.*, 191 Ariz. 222, 224, ¶ 4, 954 P.2d 580, 582 (1998).  We review de novo the interpretation of a statute.  *Open Primary Elections Now v. Bayless*, 193 Ariz. 43, 46, ¶ 9, 969 P.2d 649, 652 (1998).

### II.   Summary of Holding

¶ 19 For the reasons stated below, we hold that, given the current unsettled discussion over when life begins in this context, it is best left to the Arizona Legislature, not the courts, to decide whether to include a three-day-old, eight-cell cryopreserved pre-embryo within the statutory definition of "person" under the wrongful death statutes.  Accordingly, we affirm the superior court's dismissal of the wrongful death claim.  However, we also hold that the Jeters stated causes of action for negligent loss or destruction of the

pre-embryos, breach of fiduciary duty and breach of a bailment contract, and therefore we reverse the superior court's dismissal of those claims.

### III.   The Claim Under Arizona's Wrongful Death Statutes

■■■ ¶ 20 The superior court correctly held that under current Arizona law a cryopreserved, three-day-old eight-cell pre-embryo is not a "person" for whose loss or destruction the Jeters can recover under Arizona's wrongful death statutes as interpreted in *Summerfield v. Superior Court*, 144 Ariz. 467, 698 P.2d 712 (1985).  We decline the Jeters' request to broadly interpret the term "person" under the wrongful death statutes to conception outside a woman's womb.  We do so based on *Summerfield*, general principles of statutory construction, the status of scientific knowledge concerning embryonic development, the ongoing discussion concerning when life begins, the unintended consequences that may result from such a judicial holding and case law from other jurisdictions.  Given these factors and principles, we conclude that, subject to constitutional limitations, a decision to expand the definition of "person" for purposes of the wrongful death statutes beyond that stated in *Summerfield* is best left to the Legislature.

#### A.   *Summerfield and Arizona's Wrongful Death Statutes*

¶ 21 Arizona's wrongful death statute provides, in pertinent part:

> When death of a *person* is caused by wrongful act, neglect or default, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action to recover damages in respect thereof, then, and in every such case, the person who or the corporation which would have been liable if death had not ensued shall be liable to an action for damages, notwithstanding the death of the person injured. . . .

---

tion for attorneys' fees.  Mayo subsequently withdrew that notice, and this Court dismissed the

cross-appeal.

A.R.S. § 12–611 (emphasis added). The Arizona Legislature has not defined the meaning of "person" under the statute. In *Summerfield*, our supreme court interpreted that word's meaning. Disapproving a prior decision that required a live birth for a fetus to be considered a person under the wrongful death statutes, the court adopted a more expansive view of the term "person" under the wrongful death statutes, holding it to include a viable fetus, meaning the ability of a fetus to live outside the womb. 144 Ariz. at 477–79, 698 P.2d at 722–24 (disapproving *Kilmer v. Hicks*, 22 Ariz.App. 552, 529 P.2d 706 (1974)).

¶ 22 In *Summerfield*, the plaintiffs brought a wrongful death action, alleging that their thirty-seven-week-old fetus was stillborn as a result of the defendant physician's medical malpractice. *Id.* at 470, 698 P.2d at 715. The trial court dismissed the action on the basis that a fetus was not a "person" under A.R.S. § 12–611. *Id.* The supreme court reversed, holding that the term "person" as used in the wrongful death statutes "encompasses a stillborn, *viable* fetus" for which a wrongful death claim could be brought. *Id.* at 479, 698 P.2d at 724 (emphasis added).

¶ 23 Of particular import to this case is the supreme court's restriction of its holding to only allow wrongful death claims arising from the death of a *viable* fetus. *Id.* at 477, 698 P.2d at 722. The court recognized that viability was still somewhat of an arbitrary line, but determined that it was a "less arbitrary and more logical point than the moment of birth." *Id.* The court stated that one of the prerequisites for recovery under the wrongful death statutes "is the ability of the injured party to maintain an action if death had not ensued." *Id.* at 475, 698 P.2d at 720. The court held that "the common law now recognizes that it is the ability of the fetus to sustain life independently of the mother's body that should determine when tort law should recognize it as a 'person' whose loss is compensable to the survivors." *Id.* at 477, 698 P.2d at 722. The court agreed with the Missouri Supreme Court that if "[b]ut for the injury" a viable fetus would have been born, thereby entitling the child to sue for his or her injury, the fetus is a "person" for purposes of a wrongful death action. *Id.* at 475,

698 P.2d at 720 (citing *O'Grady v. Brown*, 654 S.W.2d 904, 911 (Mo.1983)).

¶ 24 Unlike a viable fetus, many variables affect whether a fertilized egg outside the womb will eventually result in the birth of a child, *see* ¶ 46, *infra.* This makes it speculative at best to conclude that "but for the injury" to the fertilized egg a child would have been born and therefore entitled to bring suit for the injury. *See, generally, Robertson v. Sixpence Inns of America, Inc.,* 163 Ariz. 539, 546, 789 P.2d 1040, 1047 (1990)(holding causation cannot be left to speculation). The absence of this prerequisite to "personhood" supports a conclusion that pre-implantation fertilized human eggs are not "persons" for purposes of § 12–611.

¶ 25 Other considerations which led to the result in *Summerfield* also support our conclusion not to further judicially broaden the meaning of "person" under the wrongful death statute without express Legislative direction. The *Summerfield* court examined the Legislature's goals in enacting the wrongful death statute and concluded that including a viable fetus in the definition of "person" furthered these goals. *Id.* at 476, 789 P.2d at 721. First, the court identified compensation to survivors for the loss of victims as a goal in enacting the wrongful death statute. *Id.* Second, the court recognized protection of a viable fetus as a legislative goal in laws concerning abortions and crimes. *Id.* In light of this overall legislative policy of compensation and protection of viable fetuses, the court construed the wrongful death statute as giving parents a remedy when their viable fetus is negligently killed. *Id.*

¶ 26 While allowing a parent to maintain a wrongful death action for loss of a pre-implantation fertilized egg may further the compensation goal, it would not further any protection goal advanced by the Legislature. Currently, no statute in Arizona protects fertilized eggs outside the womb in the way statutes protect fetuses and embryos implanted in wombs. *See, e.g.,* A.R.S. § 13–1103(A)(5),(B)(providing a person commits manslaughter for knowingly or recklessly causing death of unborn child in womb at any

stage of development by physically harming mother). *Compare* A.R.S. § 36–2301 (imposing duty on physicians performing abortions to maintain life of any fetus or embryo *delivered alive* ). Consequently, and because parents may otherwise obtain compensation by filing other actions for loss of pre-implantation fertilized eggs, legislative policy would not be furthered by including such fertilized eggs within the definition of "person" for purposes of the wrongful death statute.

¶ 27 The *Summerfield* court also surveyed other jurisdictions and concluded that the common law "recognizes that it is the ability of the fetus to sustain life independently of the mother's body that should determine when tort law should recognize it as a 'person' whose loss is compensable to the survivors." *Summerfield,* 144 Ariz. at 477, 698 P.2d at 722. In the twenty years since *Summerfield,* most jurisdictions have limited the definition of "person" in wrongful death statutes to a point after the fetus is viable. *See,* ¶¶ 55–59, *infra,* and cases cited therein. Thus, the common law does not currently require "the growth and evolution" of Arizona's wrongful death statutes to include a pre-implantation fertilized egg within the definition of "person" in A.R.S. § 12–611. *See Summerfield,* 144 Ariz. at 473, 698 P.2d at 718.

¶ 28 In conclusion, the *Summerfield* model of analysis yields a conclusion that a fertilized human egg outside the womb is not a "person" within the meaning of A.R.S. § 12–611 regardless of whether that fertilized egg constitutes human life or potential human life.

*B. Principles of Statutory Construction*

¶ 29 Principles of statutory construction also support our conclusion that the wrongful death statute does not encompass the loss of a cryopreserved pre-embryo. The ultimate goal of statutory construction is to give effect to the Legislature's intent. *People's Choice TV Corp. v. City of Tucson,* 202 Ariz. 401, 403, ¶ 7, 46 P.3d 412, 414 (2002). When seeking the intent of the Legislature, we first look to the plain wording of the statute. *In re Adam P.,* 201 Ariz. 289, 291, ¶ 12, 34 P.3d 398, 400 (App.2001). If that language is un-

ambiguous, we apply it without use of other means of statutory construction. *Aros v. Beneficial Ariz., Inc.,* 194 Ariz. 62, 66, 977 P.2d 784, 788 (1999). However, when the statutory language does not make that intent clear, we construe the statute to ascertain that intent using a number of principles of statutory construction. *Id.* Each such principle relevant to the issue presented here supports our conclusion that this Court should not interpret the term "person" as used in A.R.S. § 12–611 as including a cryopreserved three-day-old pre-embryo.

¶ 30 As noted above, A.R.S. § 12–611 simply refers to a "person" without further explanation. As such, the statutory language is not clear whether the Legislature intended to protect such pre-embryos as persons for purposes of those statutes. Accordingly, we must apply various principles to determine the Legislature's intent.

¶ 31 First, if the Legislature's intent is not clear on the face of the statute, we look to see whether the Legislature has amended or recodified the statute following a judicial construction of the statute. If the Legislature has so acted, it is presumed the Legislature knew of the judicial construction and by amending or recodifying the statute without addressing that construction, approved of the judicial decision. *Fisher v. Kaufman,* 201 Ariz. 500, 502, ¶ 12, 38 P.3d 38, 40 (App.2001) (Legislature is presumed to know of court decisions interpreting statutory language and to approve those decisions when it retains the language.); *Hause v. City of Tucson,* 199 Ariz. 499, 502, ¶ 10, 19 P.3d 640, 643 (App. 2001) (Court will not presume Legislature intended to supersede supreme court's interpretation of statute unless it did so explicitly or such a conclusion is clearly required by the language or effect of the statute; when Legislature reenacts statute without change, court presumes the Legislature adopted supreme court's interpretation.) (citing *Madrigal v. Indus. Comm'n,* 69 Ariz. 138, 144, 210 P.2d 967, 971 (1949)).

¶ 32 The supreme court decided *Summerfield* in 1985. In 2000, the Legislature amended A.R.S. § 12–612 to address who can be a party plaintiff for a child. 2000 Ariz.

Sess. Laws, ch. 182, § 1. Pursuant to the above rules of statutory construction, the Legislature knew of *Summerfield* and did not amend any language in the wrongful death statute to address whether the Act applied to the death of a nonviable fetus, no less a cryopreserved three-day-old pre-embryo. Accordingly, we presume the Legislature approved of the supreme court's construction of the term "person" to include a "viable" fetus.[4]

¶ 33 Second, we must not construe a statute to reach an absurd result. *Bilke v. State*, 206 Ariz. 462, 464, ¶ 11, 80 P.3d 269, 271 (2003). A court must also consider the consequences of those constructions to see what light they shed on the proper interpretation. *Walter v. Wilkinson*, 198 Ariz. 431, 433, ¶ 10, 10 P.3d 1218, 1220 (App.2000). If this Court were to interpret the concept of "person" for purposes of the wrongful death statutes to include cryopreserved three-day-old eight-cell pre-embryos such as those involved here, a number of difficulties could arise. For example, it is unclear how long a pre-embryo can safely remain in a cryopreserved state.[5] If the female donor decided she did not want another child, the clinic would be faced with the dilemma of allowing the pre-embryos to be irretrievably damaged by indefinite storage and face potential liability for a wrongful death.

4. Our conclusion as to legislative intent is implicitly supported by the Legislature's recent amendment to the criminal code. In 2005, the Legislature expanded the definition of negligent homicide, second-degree murder and first-degree murder to include deaths of an unborn child "in the womb at any stage of its development." 2005 Ariz. Sess. Laws, ch. 188, §§ 4–7. This Court had held in *State v. Cotton*, 197 Ariz. 584, 587, ¶ 10, 5 P.3d 918, 921 (App.2000), that the homicide statutes did not apply to a fetus since the statutes did not refer to them. The 2005 statutory amendments supersede that holding.

We recognize that the Legislature has used the word "embryo" in other statutes unrelated to the wrongful death statutes. None of these uses supports the argument that the Legislature's use of "person" in A.R.S. § 12–612 was intended to include a cryopreserved in vitro pre-embryo. *E.g.*, A.R.S. §§ 36–2301 *et seq.* (requiring physician performing abortion in which a human fetus is born alive to promote and preserve the life of such fetus and prohibiting certain types of research on any human fetus or embryo resulting from an induced abortion). Section 36–2301

¶ 34 Each of these principles of statutory construction weighs in favor of preserving the current test under *Summerfield* for a "person" for purposes of our wrongful death statutes—that of a viable fetus. Moreover, the special types of respect due embryos and pre-embryos can be met without the need to broadly expand the definition of "person" for the wrongful death statutes.

### C. The Jeters' Claim to Expand the Definition of Viability

¶ 35 Given the decision-making model utilized in *Summerfield* and principles of statutory interpretation, we could conclude that the Jeters' claim for wrongful death of the pre-embryos fails as a matter of law. However, as the court made clear in *Summerfield*, 144 Ariz. at 473, 698 P.2d at 718, in the context of the wrongful death statute the courts should play an important role in the development of the common-law attributes of wrongful death actions, especially when the Legislature has not "occupied the field so fully as to preclude judicial development." 144 Ariz. at 472–73, 698 P.2d at 717–18. The Jeters invite this Court to participate in that evolution, pointing out that the court in *Summerfield* relied in part on advances of scientific knowledge concerning embryonic development to expand the meaning of the term

(2003) does not affect our decision because it is unrelated to the wrongful death statutes, does not define the word "embryo," and appears to be limited to "embryos" in vivo by its use of the term "delivered alive." It also limited such research to embryos resulting from an induced abortion. A.R.S. § 36–2302(A) (2003). The federal courts have declared the statute void for being unconstitutionally vague. *Forbes v. Woods*, 71 F.Supp.2d 1015, 1020 (D.Ariz.1999), aff'd sub nom. *Forbes v. Napolitano*, 236 F.3d 1009 (9th Cir.), amended by *Forbes v. Napolitano*, 247 F.3d 903 (9th Cir.2000), and *Forbes v. Napolitano*, 260 F.3d 1159 (9th Cir.2001).

5. Melinda Troeger, Comment, *The Legal Status of Frozen Pre–Embryos When a Dispute Arises During Divorce*, 18 J.Amer. Acad. Matrimonial Lawyers 563, 565 (July 2004). Compare PCB at 29 (citing one study that such preserved organisms can last 50 years or longer in a frozen state) with *Davis*, 842 S.W.2d at 598 n. 22 (as of 1990, maximum length of pre-implantation viability was two years although some authors claimed ten-year period).

"person" in the wrongful death statute. *Id.* at 473–77, 698 P.2d at 716–20. The Jeters contend that since 1984, when *Summerfield* was decided, knowledge of embryonic development and viability has advanced to the point where, as a matter of law, courts can and should broaden the meaning of "person" to include cryopreserved pre-embryos.

¶ 36 It is important to understand what the Jeters argue. Neither in the superior court nor in this Court did the Jeters claim that they had evidence to support a view that a cryopreserved pre-embryo fits within the definition of a viable fetus as discussed in *Summerfield,* that is, an entity which can presently survive to birth outside of the womb. Rather, relying on various treatises,[6] the Jeters contend that medical science has so advanced since the supreme court decided *Summerfield,* that as a matter of law and statutory construction, this Court should expand the definition of a "person" articulated in *Summerfield* to allow wrongful death actions for the loss of cryopreserved three-day-old eight-celled pre-embryos because they have the potential to become viable. They contend those medical advances allow such pre-embryos to maintain "extrauterine" life via the cryopreservation process.

¶ 37 Particularly given the current scientific, ethical, social and legal controversy over when life should be considered to begin, we decline to so interpret the meaning of the term "person" in the wrongful death statute. Absent a specific legislative definition of "person," we could decide whether a broader common-law interpretation of that term is legally appropriate. *Summerfield,* 144 Ariz. at 472–73, 698 P.2d at 717–18. However, as a matter of judicial restraint such a decision currently is best left to the Legislature subject to any constitutional constraints.

¶ 38 We decline the Jeters' invitation for two reasons. First, their position broadens the definition of viability to a point of "potential viability," whereas the court in *Summerfield* was using viability to mean the present ability of the entity to exist and fully develop to birth outside of the womb. Our understanding of scientific knowledge at the current time does not support a broadening of this legal definition to potential viability absent legislative direction. Second, such a broadening of the term "person" requires balancing of a number of other factors and societal interests best left to the Legislature.

### 1. Potential vs. Present Viability

¶ 39 The Jeters claim that given scientific advancements, courts should, as a matter of law, broaden the term "person" in this context to include pre-embryos. The Jeters do not contend that three-day-old, eight-celled cryopreserved pre-embryos can exist and develop into viable entities ex utero. Rather, they claim that it is the pre-embryos potential to become viable, if later implanted in a womb, which should govern our decision.

¶ 40 As a legal matter, this argument misstates the idea of viability. In this context, "viability" means that, once implanted in the womb, the embryo has reached a stage of development that, if it is taken out of the womb, it would be viable. *Thibert v. Milka,* 419 Mass. 693, 646 N.E.2d 1025, 1026–27 (1995).[7]

¶ 41 Current scientific knowledge concerning embryonic development underscores the difference between a viable fetus in vivo and an eight-cell, three-day-old pre-embryo in vitro. Such knowledge is important to help guide, but not dictate resolutions of the problem. Maienschein at 10.[8]

6. Given the lack of case law on the issue of the status of pre-embryos, it is appropriate to rely on legal and medical-legal treatises to address this argument. *Davis,* 842 S.W.2d at 590.

7. Indeed, if one takes the Jeters' argument to its logical extreme, cryopreserved sperm and unfertilized eggs should also be "persons" for purposes of the wrongful death statutes because they would become "viable" once fertilized.

8. As Professor Maienschein points out in her discussion of the history of knowledge concerning embryonic development, erroneous pre-conceptions about science and medicine have often led to erroneous policy and to unjust implementations of that policy. She cites as a notable example the belief in eugenics in the early 20th Century that eventually led to the sterilization of people with remedial disabilities on the mistaken belief that such disabled persons were imbeciles. Thus, the oft-quoted statement that sterilization of such disabled persons was necessary because "[t]hree generations of imbeciles are enough." Maienschein at 103–07 (quoting *Buck v. Bell,* 274

¶ 42 We summarize our understanding of the current state of knowledge of embryonic development not to dictate or prejudge any decision as to when life should be considered to begin for purposes of a wrongful death action. Rather, we do so to fairly respond to the Jeters' claim that, as a matter of law, a court should re-interpret the wrongful death statutes to define "person" to include a cryopreserved three-day old, eight-celled fertilized egg. The following summary is taken from a number of sources, including Maienschein at 256–62; Ronald M. Green, *The Human Embryo Research Debates—Bioethics in the Vortex of Controversy* at 6–8, 27–29, 42 (2001) ("Green"); Andrea L. Bonnicksen, *Crafting a Cloning Policy—From Dolly to Stem Cells* at 20–25 & 69–71 (2002) ("Bonnicksen"); James A. Thomson, *Human Embryonic Stem Cells,* in *The Human Embryonic Stem Cell Debate* (Suzanne Holland, Karen LeBacqz, Laurie Zoloth, eds.) (2001) ("Holland") at 15; Thomas A. Shannon, *From the Micro to the Macro,* in Holland at 178; Kiessling at 1055–65.

¶ 43 Traditionally an egg is fertilized by the combining of an egg and a sperm, which are collectively referred to as gametes. Once an egg is fertilized, whether in vivo or in vitro, it can be referred to as a one-cell zygote. After two to three days of division, the cells are blastomeres. At that time, the pre-embryo consists of eight cells, all of which are totipotent, meaning that any of the cells could develop into any type of tissue and could theoretically develop into eight separate fetuses. At four to six days, it is .1 millimeter in diameter, at which time the cells begin to separate and migrate.

¶ 44 If growth proceeds normally, the outer cells will eventually become the placenta and tissue supporting the fetus while the inner cells, called the inner cell mass, will become the fetus. At five to six days of development, it is called a blastocyst and consists of a hollow ball of approximately 100 cells. These cells are pluripotent, meaning that they have started to specialize but can still develop into various types of tissue. Scientists are still learning how the cells function at this point of development.

¶ 45 By the ninth or tenth day, if in vivo and if it has continued to develop, the blastocyst will implant in the uterine wall.[9] At day fourteen, a critical development occurs—the creation of the primitive streak with three layers of specialized cells that will develop into all the fetus' tissues and cells if development continues. At this point it has approximately 2000 cells; the groove or middle line reflects a head-tail and left-right orientation. By day 22 of normal development, the heart begins to beat, and, by day 40, some body parts are recognizable in primitive form. At eight weeks, if it has continued to develop, most of the organ systems have appeared.

¶ 46 As noted above, the occurrence of each of these events depends on the ability of the organism to continue to develop. This is problematic because the percentage of pre-embryos that develop into a fetus and a live birth is not high, regardless whether it is developing in vivo or in vitro, but it is significantly lower for cryopreserved pre-embryos. The President's Council on Bioethics has estimated that, in 2001, only 32.8% of assisted reproductive technology fertilized organisms developed into a pregnancy if not cryopreserved. Only 27% led to live births. For cryopreserved pre-embryos, only 65% survived thawing and only 20.3% led to live births. Moreover, in 2001, 72% of all assisted reproductive technology transfers failed to lead to a birth. PCB at 29, 31–33 & 46.[10]

U.S. 200, 207, 47 S.Ct. 584, 71 L.Ed. 1000 (1927)).

9. Physicians generally attempt to transfer the pre-embryo to the woman on the second or third day after fertilization, or wait until the fifth day. PCB at 30.

10. Other authors have come to similar conclusions. *See* Maienschein at 165 (more than one half of all fertilized eggs never get implanted for natural reasons or abort spontaneously); Reproductive Medical Associates of New York, LLP, *Treatment Options: Embryo Cryopreservation,* http://www. rmaofny.com/cryo.asp (last visited June 29, 2005) (nearly 50% of all cryopreserved pre-embryos do not survive thawing process); Bonnicksen at 23 (approximately two-thirds of embryos do not survive and most are lost in the first fourteen days after fertilization); Green at 37 (between 67% and 75% of in vivo fertilized eggs do not implant); *Davis,* 842 S.W.2d at 595 n. 19 (as of 1990, a pre-embryo in a petri dish, has only 13 to 21% chance of achieving actual

¶ 47 Many pre-embryos are simply damaged during the treatment of the woman donor in preparing for the harvesting of eggs. Green at 56–59, 72–73. Some pre-embryos simply stop developing as early as the first two cell divisions. It is posited that the cessation of development may be a natural event to eliminate organisms when there is some inherent defect that would eventually stop further development into a fetus. Green at 9.

¶ 48 Our supreme court's decision in *Summerfield* clearly provided that present viability is a prerequisite to recovery under A.R.S. § 12–611. As shown by the above summary of our knowledge of embryonic development, one- to eight-cell cryopreserved pre-embryos stored in straws are not presently viable at that stage of the reproductive process and are incapable of developing into children via an extrauterine process. The cryopreserved pre-embryos are not then viable, as required by *Summerfield*, 144 Ariz. at 475, 698 P.2d at 720. Rather, they only have a remote potential to become viable.[11] As such, it is best left to the Legislature, not to the courts, to determine whether "person" in this context should include cryopreserved pre-embryos.

### 2. The Current Discussion Over the Beginning of Life

¶ 49 We also reject the Jeters' invitation to more broadly define "person" in this context because such a decision would have impor-

tant ramifications requiring the balancing of various issues and interests that are best left to the Legislature to consider.

¶ 50 The discussion over when society should consider human life to begin has existed since the at least the 4th Century B.C.E. Maienschein at 7–10. As Professor Maienschein explains, the nature of the disagreement has evolved as knowledge of embryonic development has advanced. *Id.* at 13–298. While the Jeters rely on several medical-legal texts to support their argument that human life begins at conception, those texts are only part of the discussion among scientists, philosophers, ethicists and the public as a whole on the issue of when society should consider life to begin. Most of these authors do not support the idea of expanding the concept to cryopreserved pre-embryos. To the extent any of them do, it is that very unsettled discussion that underscores the need for the Legislature, not the courts, to balance the various factors and policy concerns on this issue.[12]

¶ 51 As explained by both Forsythe at 504–10 and Green at 22–25 and 63–66, there are various theories of what constitutes a "person." One current analysis is to examine various subjective attributes including the capacity to feel pain, experience pleasure, survive and react to the environment. In contrast, various authors taking a developmental perspective consider implantation, develop-

---

implantation); Center for Applied Reproductive Science, *Rationale for Cryopreservation*, http://ivf-et.com/ tlc/fact_cryo preservation.html (last visited June 29, 2005) (pregnancy success rate using thawed pre-embryos ranges up to 30%).

11. We recognize, as did the supreme court in *Summerfield*, that choosing viability as the point at which a fetus becomes a person for wrongful death purposes is arbitrary. 144 Ariz. at 477, 698 P.2d at 722. However, the Jeters' contention that fertilization is a bright line test ignores the current discussion that fertilization itself is not a distinct event but rather a process of reactions. Kiessling at 1057–61; Ronald M. Green, *Determining Moral Status*, 2 Amer.J.Bioethics 20 at 20–22 (Winter 2002); Green at 27–29.

12. Gary A. Meadows, *Wrongful Death and the Lost Society of the Unborn*, 12 J. Legal Med. 99 (1992) ("Meadows"); Daniel S. Meade, *Wrongful Death and the Unborn Child: Should Viability be a Prerequisite for a Cause of Action?*, 14 J. Contemp. Health L. & Pol'y 421 (1998) ("Meade");

John A. Robertson, *In the Beginning: The Legal Status of Early Embryos*, 76 Va. L.Rev. 437 (1990) ("Robertson"); Clarke D. Forsythe, *Human Cloning and the Constitution*, 32 Val. U.L.Rev. 469 (1998) ("Forsythe"). Some of these authors contend that viability as a test for when a person exists for wrongful death actions is arbitrary and provides immunity to a tortfeasor. Meade at 441–49; Meadows at 112–14. Only one author contends that all aspects of developmental individuality for purposes of determining when an embryo is a "person" for civil and criminal liability is not "morally relevant [because] ... a human organism is present." Forsythe at 506–13. None of the other authors calls for expansion of wrongful death actions to cryopreserved pre-embryos, and one of them notes that pre-embryos should not be considered "persons" but only granted special respect, noting the need to balance interests addressed. Robertson at 441–47.

ment of the embryonic disc at fourteen days of fertilization, sentience, viability and/or the existence of brain waves. The 1994 National Institutes of Health Human Embryo Research Panel took a pluralistic approach, examining the increasing possession of qualities that make respecting the entity more compelling. An opposing view contends a human being is created at the time of fertilization because at that time the embryo has an active capacity to eventually articulate itself into a human being. Forsythe at 474–78. The lack of any clear, generally accepted concept of when "personhood" occurs further supports leaving the decision as to further expanding the term "person" for wrongful death purposes to the Legislature.[13]

¶ 52 Indeed, there are important societal interests which help fuel the current discussion concerning when life should be considered to begin. On the one side is the contention that there are benefits of utilizing human pre-embryonic material for stem cell research to diagnose and treat severe medical conditions, including infertility. This interest, however, is balanced against respect for human life. The balancing of these issues is not simply black and white, but a gray continuum. Most of the commentators recognize both the relative respect to which embryonic material is entitled and the value of using that material for scientific and medical research. PCB at 123–27 and 223–24 (noting value of embryonic material in stem cell research balanced against respect due embryos at least after fourteen days of development); Francois Baylis, *Human Embryonic Stem Cell Research: Comments on the NBAC Report*, in Holland at 53–4 (quoting the National Bioethics Advisory Commission 1999 Report that such organisms are to be destroyed only with good reason such as when necessary for research to develop cures for life-threatening or severely debilitating diseases when no less morally sound alternatives are available); Kevin P. Quinn, *The Politics of Embryonic Discourse*, 36 Conn. L.Rev. 1163, 1168 (2004) ("[E]arly embryos and nuclear transplants deserve respect 'in virtue of the kind of entity they are.' "); Lebacqz, *On the Elusive Nature of Respect*, in Holland at 149 (discussing various concepts of respect and that scientists can show respect for embryonic material used for research by engaging in careful practices of research ethics).[14]

13. While the concept of viability for purposes of wrongful death statutes has been criticized, that criticism has focused in part both on the arbitrary nature of viability and on those cases that have adopted viability from the United States Supreme Court's decision in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Meade at 442–47. Even that call for a broader definition of person has been limited to fertilization within the woman's womb. *Id.* at 447. The court in *Summerfield* expressly rejected abortion law decisions as a basis for its adoption of the viability test. 144 Ariz. at 474–78, 698 P.2d at 719–23.

14. Other views include: Guenin at 1119–20 (Female donor should have right to decline intrauterine transfer of and donate in vitro embryo for medical research because once decision is made not to implant in vitro pre-embryo it lacks any developmental potential.); Thomas B. Okarma, *Human Embryonic Stem Cells: A Primer On the Technology and its Medical Applications,* in Holland at 1 (discussing value of embryonic stem cell research but noting that such cells are derived from embryos that many people believe carry moral status); Thomson (discussing value of embryonic stem cell research); Shannon, *From the Micro to the Macro,* in Holland at 177 (discussing value of embryonic stem cell research and noting that until about fourteen days of development blastomeres are not morally privileged by virtue of individuality or personhood; however noting that such embryos should not be generated for research); Keith E. Latham and Carmen Sapienza, *Developmental Potential as a Criterion for Understanding and Defining Embryos,* 36 Conn. L.Rev. 1171, 1171–74 (2004) (criticizing the use of terms such as pre-implantation embryos and arguing that a measurable potential for development beyond fertilization is a key concept in shaping the debate on treatment of embryos); Ernle W.D. Young, *Ethical Issues: A Secular Perspective,* in Holland at 163 (discussing the conflict between faith and reason on issue of when life begins and noting various criteria for determining the point at which embryonic material should be due respect); Maienschein at 144–50 (discussing the ethical issues presented by the first birth of a human from in vitro fertilization in 1978).

The importance of this discussion is heightened by the number of cryopreserved pre-embryos. One study shows that there are more than 400,000 cryopreserved pre-embryos in the United States, although only a small percentage had been donated for research. David I. Hoffman, et al., *Cryopreserved Embryos in the United States and Their Availability for Research,* 79 Fertility and Sterility 1063 (2003). The President's

¶ 53 It is the balancing of these two primary concerns that underscores the need for reasoned legislative, not judicial, decision-making as to the nature of a "person" under the wrongful death statutes. Indeed, it is exactly this balance that led the current President's Commission on Bioethics to recommend that Congress prohibit the use of cryopreserved pre-embryos in research to those developed beyond ten to fourteen days after fertilization. PCB at 223.[15]

¶ 54 We cite the above scientific and ethical authorities to reflect why, given the balancing of societal interests, courts should not expand the scope of the wrongful death statute absent legislative direction. It should be up to the Legislature and not the courts to consider and balance the competing interests and policy questions involved in whether to further expand the meaning of "person" beyond that explained in *Summerfield* and when to consider life as beginning.

### D. Case Law from Other Jurisdictions

¶ 55 The Jeters also rely on cases from other jurisdictions to contend that, as a matter of law and without further legislative action, this Court should interpret the word "person" to include cryopreserved pre-embryos for purposes of the wrongful death statute. Consistent with *Summerfield*, the vast majority of jurisdictions have limited the definition of "person" in wrongful death statutes to a viable fetus in vivo. Forsythe at 498; Meade at 421–23. *See also McClain v. Univ. of Mich. Bd. of Regents*, 256 Mich.App. 492, 665 N.W.2d 484, 486 (2003) (non-viable fetus not a person for purposes of wrongful death statutes); *Wiersma v. Maple Leaf Farms*, 543 N.W.2d 787, 790 (S.D.1996) (noting that majority of jurisdictions hold that viability is element of wrongful death statutes); *Thibert*, 646 N.E.2d at 1027 n. 8 (same); *Connor v. Monkem Co.*, 898 S.W.2d 89, 93 (Mo.1995) (same). We do not find persuasive the cases relied upon by the Jeters for their argument to have this Court expand the law in this area.

¶ 56 The Jeters contend that eleven jurisdictions now provide that viability of a fetus is not an element for a claim for wrongful death. However, none of these cases extends wrongful death causes of action to in vitro pre-embryos. Indeed, several of the cases the Jeters cite actually reject the Jeters' position or hold a wrongful death claim may be made regardless of viability, but only if the fetus is born alive.[16] Other cases relied on by the Jeters extended the cause of action to non-viable fetuses in vivo because the applicable wrongful death statutes specifically provided for such a cause of action, unlike Arizona's wrongful death statutes.[17]

Commission has also cited that statistic. PCB at 124.

**15.** Because of the division of the PCB on this issue, it stated that *"[t]his recommendation should not be construed as silently endorsing (or opposing) embryo research at earlier stages."* PCB at 223. While some PCB members opposed such research at any stage, others favored allowing research even beyond such point. *See* Personal Statements of PCB members attached as appendices to the PCB at 229.
  The Arizona Legislature has enacted legislation barring state governmental funding of research involving human cloning but not pre-embryos. 2005 Ariz. Sess. Laws, ch. 180.

**16.** *See Gentry v. Gilmore*, 613 So.2d 1241, 1244 (Ala.1993) (rejecting wrongful death action for miscarriage of non-viable, thirteen-week fetus); *Smith v. Borello*, 370 Md. 227, 804 A.2d 1151, 1155–56 (App.2002) (no wrongful death action for nineteen-week, non-viable stillborn fetus); *Crosby v. Glasscock Trucking Co., Inc.*, 340 S.C. 626, 532 S.E.2d 856, 857 (2000) (estate of twenty-week, non-viable, stillborn fetus may not bring wrongful death action); *Modaber v. Kelley*, 232

Va. 60, 348 S.E.2d 233, 236–37 (1986) (denying wrongful death recovery because unborn child is not a "person" under wrongful death statutes). *See also Thibert*, 646 N.E.2d at 1027 (refusing to extend wrongful death statutes to non-viable fetus in vivo without legislative amendment; distinguishing *Torigian v. Watertown News Co.*, 352 Mass. 446, 225 N.E.2d 926, 927 (1967), which extended cause of action to non-viable fetus if fetus was born alive); *Nealis v. Baird*, 996 P.2d 438, 454 (viability is not element if fetus was born alive); *Ladov v. Skrentner*, 431 Pa.Super. 152, 636 A.2d 176, 182 (1994) (same); *Group Health Assn., Inc. v. Blumenthal*, 295 Md. 104, 453 A.2d 1198, 1206 (1983) (same).

**17.** *See Wiersma*, 543 N.W.2d at 790 (statute provided for wrongful death action of a person "including any unborn child"); *Connor*, 898 S.W.2d at 93 (statute provided that human life begins at conception and unborn children have protectible interest in life with statutes to be construed to acknowledge all rights of unborn child at every stage of development); *Smith v. Mercy Hosp. & Med. Ctr.*, 203 Ill.App.3d 465, 148 Ill.Dec. 567,

As noted above, our Legislature has only recently amended our criminal code to provide criminal sanctions for the death of a child at any stage of development in the womb. 2005 Ariz. Sess. Laws, ch. 188, §§ 4–7. It has not amended the wrongful death statute to provide for such a civil cause of action, let alone to an in vitro pre-embryo.

¶ 57 Two of the cases cited by the Jeters extended wrongful death actions to non-viable fetuses without legislative direction but required that the fetus be at some later stage of development in the womb. *Porter v. Lassiter*, 91 Ga.App. 712, 87 S.E.2d 100, 103 (1955) (wrongful death statute applied after quickening); *Danos v. St. Pierre*, 402 So.2d 633, 636–37 (La.1981) (on rehearing, permitting recovery for death of six-month-old fetus stillborn in woman's womb if, but for the fault of defendant, fetus "more probably than not would have been born normally").[18]

¶ 58 The Jeters place great emphasis on *Farley v. Sartin*, 195 W.Va. 671, 466 S.E.2d 522 (1995), which cited *Summerfield* in holding that West Virginia's nearly identical wrongful death statutes permitted a cause of action for the death of a non-viable fetus. *Id.* at 534–35 (finding that viability was an arbitrary and unjust requirement to splice onto the definition of person; instead, a "person" under the wrongful death statute should begin at conception). However, the *Farley* court expressly limited its holding to allowing such wrongful death actions to embryos in vivo, and "declin[ed] to address the issues that may arise with advances in medical technology now enabling conception outside the womb." *Id.* at 533 n. 3. Instead, the court found that the Legislature should resolve such issues. *Id.*

¶ 59 The Jeters mistakenly suggest that the Ninth Circuit endorsed *Farley* because it described *Farley* as "well-reasoned and thoughtful." *Santana v. Zilog, Inc.*, 95 F.3d 780, 785 (9th Cir.1996). To the contrary, the Ninth Circuit, applying Idaho law, declined

to follow *Farley*, noting that the West Virginia Supreme Court was the only court to recognize a cause of action for a non-viable fetus without action of the state legislature. *Id.* The Ninth Circuit adopted the viability concept endorsed by our supreme court in *Summerfield*, recognizing that, with regard to wrongful death actions, numerous courts had used "viability as the dividing line for 'personhood' because it denotes the point at which the fetus, in essence, becomes a person, or a 'separate entity capable of maintaining an independent action in its own right.' " *Id.* at 783 (internal citations omitted). The court found this test was particularly appropriate given that "the uncertainty of whether a pregnancy will culminate in a live birth is greatest at the beginning of a pregnancy. Thus, [courts] refuse to allow recovery because of the uncertainty and unpredictability of actions based on speculation that the fetus would have otherwise survived to viability." *Id.* at 783–84 (citations omitted). This reasoning is even more compelling here because the pre-embryos were cryopreserved for possible future use and might never have been implanted in the womb, much less survive to a live birth.

*E. Conclusion*

¶ 60 We decline to expand the meaning of "person" in the wrongful death statute to include a three-day-old eight-celled cryopreserved pre-embryo. Such a decision is best left to the elected representatives of the people of Arizona, subject to constitutional restraints, not a court.

¶ 61 Our conclusion that, absent clear legislative direction three-day-old, eight-cell pre-embryos are not "persons" under the wrongful death statutes, does not mean that they are property. As noted by the Tennessee Supreme Court, relying on the Report of the American Fertilization Society's Ethical Considerations of the New Reproductive

560 N.E.2d 1164, 1168–71 (1990) (statute provided cause of action for wrongful death of fetus injured after conception). *Compare 66 Federal Credit Union v. Tucker*, 853 So.2d 104, 114 (Miss. 2003) (wrongful death cause of action existed for non-viable fetus in vivo because statute provided for action for any person and courts had applied

criminal code with similar language to apply to death of non-viable fetus).

**18.** Louisiana now defines an in vitro fertilized ovum as a "juridicial person" that may not be destroyed. La. Stat. Ann. §§ 9:123 (Supp.2004), 9:129 (1991).

Technologies, pre-embryos occupy an interim category between mere human tissue and persons because of their potential to become persons. Accordingly, such embryos are due varying degrees of special respect dependent on the issue involved. *Davis,* 842 S.W.2d at 596–98. We hold only that, for purposes of Arizona's wrongful death statutes, a cryopreserved, three-day old pre-embryo is not a person.

¶ 62 This holding does not mean the Jeters are denied all causes of action for their loss. As the rest of this opinion explains, the Jeters may bring other types of actions for the allegedly wrongful loss or destruction of the pre-embryos. Those actions insure that tortfeasors may be held liable for their wrongful acts while avoiding judicial intrusion on the Legislature's need to balance various competing interests in deciding whether to expand the breadth of wrongful death actions.

### IV. The Claim for the Negligent Loss or Destruction of the Pre–Embryos

¶ 63 The Jeters assert Arizona should recognize a common-law claim for the negligent loss or destruction of the pre-embryos based upon both their right to control disposition and Mayo's undertaking of a duty of care.[19] In support of their argument, the Jeters rely on two Restatement provisions and cases from other jurisdictions recognizing causes of action for intentional and negligent harm to unborn children.

¶ 64 The cases relied upon by the Jeters provide us with little guidance. For instance, in *Smith v. Borello,* the court permitted a mother to recover emotional-distress damages for the loss of her nonviable fetus, but only as part of her own personal injury action. 804 A.2d at 1163. Similarly, in *McClain,* the Michigan Court of Appeals held that a mother who suffered a miscarriage of a nonviable fetus carried in her womb could sue for emotional distress damages but only because the miscarriage was a form of physical impact so that the loss of her pregnancy amounted to a personal injury. 665 N.W.2d at 486–88. Mrs. Jeter has not alleged that she suffered any personal injury as a result of the loss of the frozen pre-embryos.

¶ 65 The remaining published decision cited by the Jeters is also not on point. In *Perry–Rogers v. Obasaju,* 282 A.D.2d 231, 723 N.Y.S.2d 28, 29 (2001), the plaintiffs sought malpractice damages for the emotional distress arising from the defendant's mistaken implantation of their embryos into another woman's uterus, which resulted in a child being born and separated from them for four months after birth.[20]

¶ 66 The Jeters next rely on the Restatement (Second) of Torts ("Restatement") § 868 (1969), governing "Interference with Dead Bodies." This section states that "[o]ne who intentionally, recklessly or negligently removes, withholds, mutilates or operates upon the body of a dead person or prevents its proper interment or cremation is subject to liability to a member of the family of the deceased who is entitled to disposition of the body." They argue that this Court should recognize a right to control frozen pre-embryos similar to the right to control the disposition of dead bodies under Section 868 and allow them to maintain an action for emotional distress. The Jeters assert that such a quasi-property right is recognized in the few cases that have discussed custody issues involving frozen pre-embryos.

---

19. Mayo argues the Jeters abandoned their claim for "negligence—loss of irreplaceable property." We disagree. The Jeters initially labeled count two of their complaint as "negligence-loss of irreplaceable property" but subsequently in the dismissal pleadings and the appellate briefs referred to it as a claim for "negligent loss of viable human embryos." Regardless of the label attached to the claim, the substance has remained the same; the Jeters have consistently pursued a claim for the negligent loss or destruction of the pre-embryos and never abandoned count two of their complaint.

20. The Jeters also cite an unpublished decision, *Del Zio v. Presbyterian Hosp.,* 1978 U.S. Dist. LEXIS 14450 (S.D.N.Y.1978), that involved claims for conversion and intentional infliction of emotional distress for intentional destruction of unfertilized gametes. Our rules prohibit parties from citing unpublished decisions from other jurisdictions. Arizona Rule of Civil Appellate Procedure 28(c); *Walden Books Co. v. Ariz. Dept. of Rev.,* 198 Ariz. 584, 589, ¶ 23, 12 P.3d 809, 814 (App.2000). Accordingly, we do not address *Del Zio.*

¶ 67 The two cases relied upon by the Jeters are distinguishable from this case, and neither allows for an emotional distress claim under these circumstances or adopts Restatement § 868 as the basis for such a claim. In fact, neither case discusses § 868. In *Davis,* the divorcing parties each sought custody of cryopreserved pre-embryos created during the marriage. 842 S.W.2d at 594. The Tennessee Supreme Court not only refused to equate cryopreserved pre-embryos with human beings (alive or deceased), it expressly noted that they were not persons for purposes of Tennessee's wrongful death statutes but occupied "an interim category" between persons and human tissue. *Id.* at 594, 596–98. *See also PCB* at 223 (noting that cryopreserved pre-embryos at less than fourteen days of development should be accorded dignity). *Accord* Robertson at 446.

¶ 68 In *York v. Jones,* 717 F.Supp. 421, 424 (E.D.Va.1989), the plaintiffs asserted breach of contract and related claims seeking the release and transfer of their cryopreserved pre-embryos from one fertility clinic to another. The court specifically found that the plaintiffs could not pursue an emotional distress claim for the clinic's refusal to transfer the pre-embryos absent some bodily harm to the plaintiffs or exceptional circumstances. *Id.* at 423 n. 2.

¶ 69 We have already determined that under Arizona law the Jeters' cryopreserved non-viable pre-embryos were not "persons" for purposes of our wrongful death statutes. Therefore, a Restatement provision governing the right to control dead bodies is not pertinent to this case. While the Jeters are understandably distressed by the loss or destruction of their pre-embryos, Mayo's alleged loss of them is not analogous to the negligent disposition of a deceased's body such as to qualify the injured party to recovery under Restatement § 868.

¶ 70 The Jeters may, however, pursue a claim for the loss or destruction of the pre-embryos based upon Restatement § 323 (1965). This provision has been adopted as the law in Arizona, and provides:

One who undertakes, gratuitously or for consideration,[ 21] to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if:

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

In addition to physical harm, the person undertaking the act may be liable under Restatement § 323 for resulting economic harm. *Lloyd v. State Farm Mut. Auto. Ins. Co.,* 176 Ariz. 247, 250, 860 P.2d 1300, 1303 (App.1992).

¶ 71 The Jeters have alleged that Mayo undertook, for consideration, the harvesting and storing of their pre-embryos, services that Mayo should have recognized as necessary for the pre-embyros' care. Under the Restatement provision, the Jeters could maintain an action for harm resulting from the loss of "things." Given the special respect due to pre-embyros, the Jeters are also able to maintain an action against Mayo for any physical or economic harm resulting from that failure to exercise reasonable care to the extent Mayo's actions either caused the alleged harm, the loss or destruction of the pre-embryos, or increased the risk of that harm. Restatement § 323; *Lloyd,* 176 Ariz. at 250, 860 P.2d at 1303.

¶ 72 Arizona courts have adopted and applied Restatement § 323 in the medical malpractice context. *See Thompson v. Sun City Cmty. Hosp., Inc.,* 141 Ariz. 597, 607–08, 688 P.2d 605, 615–16 (1984) (reversing judgment in favor of hospital in medical malpractice action for failure to give loss of chance of recovery instruction based on Restatement § 323). Moreover, as the scientific technology at issue is relatively new, it is not surprising that the Restatement provision has yet to be applied in this precise circumstance. Mayo has not presented any grounds why

---

**21.** Mayo asserts that this Restatement provision only applies to one who "voluntarily" undertakes an act for another. Yet, the Restatement provision clearly applies to one who also undertakes an act "for consideration." Restatement § 323.

this provision may not serve as the basis for such a claim.

¶ 73 In their briefs to this Court, the Jeters interpreted *Lloyd* as precluding them from seeking one of their objectives—emotional distress damages for the negligent loss or destruction of the embryos. However, *Lloyd* did not address whether a plaintiff is allowed to recover emotional distress damages for a tortious loss of property. 176 Ariz. at 250, 860 P.2d at 1303. While a party cannot bring a claim for negligent infliction of emotional distress based merely on the negligent destruction of property,[22] a party can recover damages for emotional distress arising from the tortious loss of property if the emotional distress is unrelated to the pecuniary loss. *Reed v. Mitchell & Timbanard, P.C.,* 183 Ariz. 313, 318–19, 903 P.2d 621, 626–27 (App.1995). *See also Thomas v. Goudreault,* 163 Ariz. 159, 165–67, 786 P.2d 1010, 1016–18 (App.1989) (landlord's breach of Landlord and Tenant Act permitted tenants to recover emotional distress damages for annoyance and discomfort of living in inadequate housing).

¶ 74 Jurisdictions are divided on whether persons in the same position as the Jeters may seek emotional distress damages for the loss of a nonviable fetus or embryo absent a personal injury to themselves. *See generally,* James L. Ishen, *Recovery of Damages for Grief or Mental Anguish Resulting from Death of Child,* 45 A.L.R.4th 234 § 8 (1986 and Supp.2004). Given the interim status of pre-embryos and the special respect they should be accorded in certain situations, *Davis,* 842 S.W.2d at 594, 596, we need not decide on this limited record whether the Jeters' loss might entitle them to emotional

distress damages. We leave it to the superior court on remand to determine whether, after further factual development, such emotional distress damages are recoverable.

¶ 75 Accordingly, the Jeters may sue under § 323 for the negligent loss or destruction of their pre-embryos.

## V. The Claim for Breach of Fiduciary Duty

¶ 76 In Count Three of their complaint, the Jeters asserted a claim for breach of fiduciary duty, arguing that Mayo had assumed fiduciary duties to "properly store, safeguard, secure, maintain or account for" the pre-embryos, and because they were "potentially viable human beings, the custody of the embryos were [sic] entitled to 'special respect' and [the] highest standards of care." Mayo sought dismissal of this count on the ground that the medical malpractice act limits the grounds upon which an action may be maintained against a health care provider for services rendered and the breach of fiduciary duty claim was not one of the enumerated grounds under the statute. The superior court agreed and dismissed the count. We hold that based on the record presented, it was premature for the superior court to hold that the medical malpractice act bars this claim.[23]

¶ 77 Section 12–562(A) provides that "[a] medical malpractice action shall not be brought against a licensed health care provider except upon the grounds set forth in § 12–561." [24] Section 12–561(2) states:

"Medical malpractice action" or "cause of action for medical malpractice" means an action for injury or death against a li-

---

22. *Roman v. Carroll,* 127 Ariz. 398, 399, 621 P.2d 307, 308 (App.1980) (damages are not recoverable for negligent infliction of emotional distress from witnessing injury to property).

23. On appeal, the Jeters argue that to the extent the medical malpractice act bars this claim, it is unconstitutional. In interpreting a statute, we are not bound by the arguments of the parties if that would lead to an incorrect result. *Lyons v. State Board of Equalization,* 209 Ariz. 497, 502, n. 2, 104 P.3d 867, 872 (App.2005). Moreover, we should avoid addressing constitutional issues relating to a statute unless absolutely necessary to resolve a case. *City of Tempe v. Outdoor*

*Systems, Inc.,* 201 Ariz. 106, 109, ¶ 7, 32 P.3d 31, 34 (App.2001). Accordingly, we do not address the Jeters' constitutional claim on this issue because the viability of their claim can be resolved on other grounds.

24. The Arizona Supreme Court has held that subsection (B) of A.R.S. § 12–562 is unconstitutional to the extent it abrogates a plaintiff's action for battery, regardless of the fact the plaintiff could still bring an action under other theories of liability. *Duncan v. Scottsdale Med. Imaging, Ltd.,* 205 Ariz. 306, 314, ¶ 35, 70 P.3d 435, 444 (2003).

censed health care provider based upon such provider's alleged negligence, misconduct, errors or omissions, or breach of contract *in the rendering of health care, medical services, nursing services or other health-related services* or for the rendering of such health care, medical services, nursing services or other health-related services, without express or implied consent including an action based upon the alleged negligence, misconduct, errors or omissions or breach of contract in collecting, processing or distributing whole human blood, blood components, plasma, blood fractions or blood derivatives.

A.R.S. § 12–561(2) (emphasis added). The Jeters argue that these provisions are an unconstitutional abrogation of their right to recovery for breach of fiduciary duty in violation of the anti-abrogation clause of the Arizona Constitution. Ariz. Const. art. 18, § 6.

¶ 78 At oral argument in this Court, the Jeters stated that they had not sought to bring an action for medical malpractice. While they conceded it might be difficult to contend the storage of the pre-embryos was not related to the provision of medical services, the record is undeveloped on that issue. Mayo, on the other hand, properly conceded that if the loss of the pre-embryos was not the provision of health care services as defined by the statute, the medical malpractice act would not preclude the Jeters from suing under an alternative theory of liability.

¶ 79 Whether an action sounds in medical malpractice depends upon whether the conduct causing the injury consisted of "health care, medical services, nursing services or other health-related services" as defined by A.R.S. § 12–561(2). Whether the conduct is such a service depends on a number of factors, including whether the wrong involved the exercise of professional judgment in the treatment of the patient by health care providers or merely a failure to keep the hospital premises and equipment properly maintained. *See generally* Holly Piehler Rockwell, *What Patient Claims Against Doctor, Hospital, or Similar Health Care Provider Are Not Subject to Statutes Specifically Governing Actions and Damages for Medical Malpractice,* 89 A.L.R.4th 887

(1991) (collecting cases). *Compare Harts v. Caylor–Nickel Hosp., Inc.,* 553 N.E.2d 874 (Ind.App.1990) (action based on patient's fall from hospital bed was one for ordinary negligence rather than malpractice when failure of bed rails was neither part of diagnosis and treatment nor integral to the provision of medical treatment) *with Putnam County Hosp. v. Sells,* 619 N.E.2d 968, 971 (Ind.App.1993) (plaintiff's fall from recovery room table while under anesthesia was malpractice claim rather than premises liability claim because it involved allegedly negligent health care decisions to fail to properly train and supervise staff with regard to proper monitoring of such patients).

¶ 80 Accordingly, the medical malpractice act does not shield health care providers from all other negligence actions that may be brought against them; it simply delineates the contours of claims that may be asserted against them arising from alleged *medical* negligence. A.R.S. §§ 12–561(2) and – 562(A). By way of illustration, health care providers may still be sued for liability arising from an automobile accident or a hospital may be found negligent for a patient's slip and fall in a hospital hallway. These are negligent acts that have nothing to do with the rendering of medical or health care-related services.

¶ 81 Applying the above principles, at this stage of the litigation, it is premature to discern whether the facts rise to the level of medical malpractice. For example, it is unknown whether the pre-embryos were lost, destroyed or given to the wrong parties, or how any of these events may have occurred. If the claim is grounded in Mayo's negligent storage of the pre-embryos by non-health care personnel not using any professional judgment, it is arguably not a "medical malpractice" action governed by the medical malpractice act. A.R.S. § 12–562(A).

¶ 82 It is also unclear what interest the Jeters claim was harmed by the alleged breach of fiduciary duty. If the only interest claimed by the Jeters is their "rights" to the pre-embryos, presumably the medical malpractice act does not preclude such an action, especially if the storage and the cause of the alleged loss were not health care services as

defined by the statute. Alternatively, if the interests the Jeters claim were harmed are Mrs. Jeter's interests in her own healthcare, then the claim would presumably amount to one for medical malpractice. *See Duncan,* 205 Ariz. at 314, ¶ 32, 70 P.3d at 443 (actions for battery and for medical malpractice preserve distinct societal interests in the physician-patient relationship).

¶ 83 Depending on the factual basis for their claim and the interests they seek to protect, it is possible that the Jeters' breach of fiduciary duty claim for the loss or destruction of their pre-embryos does not arise out of the rendering of "medical" or "health-related" services by Mayo. If so, such a claim would not be within the ambit of or barred by A.R.S. §§ 12–561(2) and –562(A).

¶ 84 Given the lack of factual development in this matter, we find premature the application of the medical malpractice act to the breach of fiduciary duty claim and the resulting dismissal of that claim.

## VI. The Breach of Bailment Claim

¶ 85 The Jeters challenge the dismissal of their claim for breach of a bailment contract. Mayo argued that the Jeters did not have a *written* bailment contract as needed to pursue a breach of contract claim under the medical malpractice act. The medical malpractice act provides that "[a] medical malpractice action based upon breach of contract for professional services shall not be brought unless such contract is in writing." A.R.S. § 12–562(C). Neither of the superior court's minute entry rulings expressly addressed this issue. By dismissing the Jeters' action, however, the court implicitly found that the Jeters had failed to present evidence of a written contract sufficient to satisfy the writing requirement of the malpractice statute.

¶ 86 In response to Mayo's motion to dismiss, the Jeters submitted three written agreements that they alleged evidenced a bailment contract between the parties.

These agreements set forth the Jeters' "Consent Regarding IVF [in vitro fertilization] Services" and "Consent Regarding Thawing of Cryopreserved Embryos." They reflect an agreement by the parties that Mayo was to cryopreserve and store the pre-embryos for the Jeters' subsequent use or other instructions as to their disposition. The Jeters also submitted a copy of their "Request for Transfer of Cryopreserved Embryo or Semen Specimens and Assumption of Risk," which exhibited an obligation on the part of Mayo to deliver the ten remaining pre-embryos (in 4 straws) to the Jeters for their use at another clinic.

¶ 87 These documents, when considered together, sufficiently demonstrate a written bailment contract needed to withstand a motion to dismiss under A.R.S. § 12–562(C).[25] *See Nava v. Truly Nolen Exterminating of Houston, Inc.,* 140 Ariz. 497, 500, 683 P.2d 296, 299 (App.1984) (when personalty is delivered by another in trust for a specific purpose with an express or implied agreement, the property will be returned or accounted for when that purpose is accomplished, the transaction constitutes a bailment); *York,* 717 F.Supp. at 425 (cryopreservation agreement created a bailment contract).

¶ 88 Mayo argues that a consent form should not be seen as a written contract, no less a contract of bailment. While that argument may be correct in an ordinary consent form for performance of health care services, the consent forms here expressly reflected that the Jeters and Mayo were agreeing that Mayo would cryopreserve and store the pre-embryos. Thus, our decision that the storage agreements constitute a written bailment contract is limited to these particular circumstances.

¶ 89 This claim does not represent a conventional medical malpractice action. Such actions against professionals usually arise in tort, not contract. "As a matter of public policy, attorneys, accountants, and other professionals owe special duties to their clients,

---

**25.** In light of our decision that the Jeters presented a sufficient written contract to satisfy the requirements of A.R.S. § 12–562(C), we need not address their argument that subsection (C) of the medical malpractice act is unconstitutional un-

der the Arizona Constitution's anti-abrogation clause. *Outdoor Sys., Inc.,* 201 Ariz. at 109, ¶ 7, 32 P.3d at 34 (judicial policy is to avoid addressing constitutional issues unless absolutely necessary to resolve case).

and breaches of those duties are generally recognized as torts." *Barmat v. John and Jane Doe Partners A–D,* 155 Ariz. 519, 523, 747 P.2d 1218, 1222 (1987). An action against a professional sounds in contract only when "promises [are] expressly made or implied from conduct." *Id.*

¶ 90 Here, Mayo expressly promised to store the Jeters' pre-embryos, a "special contractual agreement" apart from any medical procurement of them. *See id.* at 524, 747 P.2d at 1223 ("Absent some special contractual relationship or undertaking between those in the professional relationship, … a professional malpractice action does not 'arise' from contract, but rather from tort."). As such, the Jeters are entitled to proceed with their claim that Mayo breached the bailment contract.

## CONCLUSION

¶ 91 We affirm the superior court's dismissal of the wrongful death claim. We reverse the court's dismissal of the claim for negligent loss or destruction of the pre-embryos, breach of fiduciary duty and breach of a bailment contract. We remand this matter for further proceedings consistent with this decision.

PHILIP HALL, P.J., concurring.

TIMMER, Judge, specially concurring.

¶ 92 Although I concur in the Majority's holding that pre-implantation fertilized human eggs are not "persons" for purposes of A.R.S. § 12–611, I write separately because I believe the Majority mistakenly concentrates much of its analysis on the debate concerning when human life begins rather than when the legislature intended a wrongful death cause of action to begin.

¶ 93 In my view, the Majority's ultimate holding is correctly reached by following the analytical model established by our supreme court in *Summerfield.* There, the court reasoned that employing traditional principles of statutory construction to divine whether the legislature intended the term "person" to include a viable fetus would be unworkable because it is unlikely the legislature considered the issue when it passed the wrongful

death statute. 144 Ariz. at 475, 698 P.2d at 720. Thus, the court resolved the issue by studying the statute, the best method to further the general legislative goal in adopting the statute, and common law principles governing its application. *Id.*

¶ 94 The Majority aptly applies the *Summerfield* model of analysis to conclude that "a fertilized human egg outside the womb is not a 'person' within the meaning of A.R.S. § 12–611 regardless of whether that fertilized egg constitutes human life or potential human life." *See* ¶ 28, *supra.* I agree with this reasoning and, for that reason alone, I concur with the Majority's resolution of the first issue on appeal. However, in my view, resolution of the issue ends after application of *Summerfield.* Consequently, I believe the Majority's discussion of the debate concerning when life begins is unnecessary, and I therefore do not join in this portion of the decision.